LIONEL G. LAFLEUR & others *vs.* CITY OF CHICOPEE
& others
(and a companion case[1]).

Hampden.    April 5, 1967. — June 15, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER,
& REARDON, JJ.

*Municipal Corporations,* Aldermen, Referendum.  *Elections.  Statute,* Acceptance.  *Words,* "Forthwith."

A unanimous vote of all the members of the board of aldermen of a city to suspend a rule of the board providing for its regular meetings on the first Tuesday of each month and to hold the next regular meeting on the second Tuesday of the month was within the power of the board, and a vote adopted at the meeting on the second Tuesday, when one member was absent, "to hold the next meeting on" the third Tuesday was to be interpreted as adjourning the meeting on the second Tuesday to the third Tuesday, rather than as calling a new special meeting; and neither the meeting on the second Tuesday nor that on the third Tuesday was governed by or invalidated by provisions of the city charter giving the mayor the power and duty to call special meetings of the board.  [750–751]

Where it appeared that at a city election it was voted affirmatively to accept a statute establishing referendum procedures for the city, that no recount of such vote was sought, and that declaration of the results of the election under G. L. c. 54, § 137, was deliberately delayed by the board of aldermen until two weeks after completion of recounts for certain offices and after expiration of the time for filing referendum petitions respecting certain orders passed by the board, it was held that the declaration of the results of the election should be treated as relating back to the date of the election, that the referendum statute took effect on that date by reason of its provision that in the event of an affirmative vote for its acceptance it should take effect "thereupon," and that adequate referendum petitions subsequently filed within the prescribed time after the passage of the board's orders were valid.  [751–753]

---

[1] The other case is Aldore Minnie & others *vs.* City of Chicopee & others, raising the same question with respect to the police department.  To avoid later confusion with *Minnie* v. *Chicopee,* 344 Mass. 743, involving many of the same parties on a somewhat similar issue, the Lafleur case, brought in behalf of various firemen, has been treated as the principal case.  In each of the present cases other members of the fire or police department, as the case may be, are the additional plaintiffs.  In addition to the city, the defendants in each case include the mayor, the members of the board of aldermen, the city clerk, the board of registrars of voters, the city auditor, the city treasurer, certain petitioners for a referendum, and Chicopee Taxpayers Association, Inc.  In the Lafleur case the chief of the fire department is a defendant.  In the Minnie case the chief of the police department is a defendant.

In a petition under G. L. c. 43, § 42, for a city referendum respecting an order passed by the board of aldermen, an omission of the specific words "taking effect" from the statement that the petitioners "protest against" the order was of no consequence.   [753]

A petition under G. L. c. 43, §§ 42, 38, for a city referendum respecting an order passed by the board of aldermen was not invalid in that it did not contain the names and addresses of "three persons designated as filing the same" where it appeared that three petitioning voters, who were stated to have circulated the petition, signed their names and added their addresses on the face sheet of the petition and were present with the city clerk in his office when the petition was filed.   [754–755]

Two BILLS IN EQUITY filed in the Superior Court on December 23, 1963.

The suits were heard by *Vallely, J.,* on a master's report.

*Francis J. Shea (Robert L. Nowak,* City Solicitor, with him) for the City of Chicopee & others; *John J. O'Connor, Jr.,* for Chicopee Taxpayers Association & others, also with him.

*William K. Danaher, Jr. (Daniel M. Keyes, Jr.,* with him) for Aldore Minnie & others.

*John F. Wagner* for Lionel G. Lafleur & others.

CUTTER, J.   These two proceedings for declaratory relief were referred to a master, who filed a consolidated report. By interlocutory decrees, the report was confirmed with the addition of two rulings of law by the trial judge.   Final decrees were entered declaring (1) that the Chicopee board of aldermen by order passed December 3, 1963, accepted St. 1963, c. 19 (providing a schedule of minimum annual compensation for police officers), and St. 1962, c. 520 (a similar statute concerning fire fighters); (2) that the plaintiffs are entitled to be paid in accordance with these statutes beginning on December 3, 1963; and (3) that referendum petitions (protesting the aldermen's order of December 3) filed with the city clerk on December 18, 1963, did not comply with G. L. c. 43, §§ 38–42, require no action by the board of aldermen, and do not affect the operation of the orders of December 3, 1963.   The defendants appealed from the interlocutory decrees and the final decrees.   The facts are stated upon the basis of the master's report and a stipulation (fn. 3).

Lafleur *v.* Chicopee.

Statute 1963, c. 734, provided that G. L. c. 43, §§ 37–44 (dealing with municipal initiative and referendum procedures), should apply to Chicopee (notwithstanding provisions of its charter found in St. 1890, c. 189, and St. 1897, c. 239, as amended) upon its acceptance by a majority of the voters at the regular municipal election in 1963. A question concerning such acceptance was placed upon the ballot. At the election held on November 5, 1963, the vote was 11,566 for acceptance and 5,759 against acceptance. Recounts for certain offices were completed on December 16, 1963. No recount was held concerning the vote of accepting St. 1963, c. 734. The election results were not "declared" (see G. L. c. 54, § 137, as amended through St. 1935, c. 55) by the board of aldermen[2] until December 30, 1963, after unnecessary postponements of such action.

On November 12, 1963, the second Tuesday of the month,[3] a meeting of the board of aldermen was held pursuant to a

---

[2] Chicopee's charter (St. 1897, c. 239) provides (emphasis supplied), in part (§ 2), "The administration of all the . . . affairs [except those relating to the public schools] of said city . . . shall . . . be vested in an executive department . . . the mayor, and in a legislative department, which shall consist of . . . the board of aldermen . . . ." (§ 13), "The board of aldermen shall hold regular meetings at such times as may be designated by the board *by general rule.* The *mayor* may at any time call *a special meeting* . . . and shall call a special meeting upon the request in writing of one third of the members. Such request *shall state the subjects to be considered* at the meeting. The mayor shall cause . . . [at least a twenty-four hour] written notice of such special meeting, *stating the subjects to be considered thereat,* to be given in hand to each member or to be left at his usual place of residence . . . and *no final action shall be taken at such special meeting on any business not stated in such notice,* except with the unanimous consent of *all the members of the board.* . . ." (§ 14), "The board of aldermen shall determine the rules of its own proceedings and *shall be the judge of the election* and qualifications of its own members. . . . A majority of the members . . . shall constitute a quorum, but a smaller number may adjourn from day to day. The board shall, so far as is not inconsistent with this act, have and exercise all the legislative powers of towns . . . and . . . all the powers . . . [of] the city . . . and it may by ordinance prescribe the manner in which such powers shall be exercised." (§ 27), "Every ordinance, order . . . or vote of the board of aldermen . . . [exceptions not relevant] shall be presented to the mayor. If he approves thereof he shall signify his approval by signing the same, but if not he shall return the same with his objections, to the board . . . which shall . . . proceed to reconsider . . . [the same] and if . . . two thirds of the board . . . notwithstanding such objections, vote to pass the same, it shall be in force. . . ."

[3] Rule 1 of the Rules and Orders of the board provided, "Regular meetings . . . shall be held on the first Tuesday evening in each month, at 7:30 o'clock, except when such day is a legal holiday, in which case the regular meeting for that month shall be held on the succeeding Wednesday evening." The mas-

unanimous vote of all the members of the board at a meeting held on October 22, 1963, that Rule 1 "be suspended, and the November regular meeting be held November 12, 1963." Notice of this proposed action was contained in the agenda distributed to each alderman by city messenger twenty four hours in advance of the October 22 meeting. On November 12, one alderman was absent. The rules were suspended by unanimous vote. Orders accepting St. 1963, c. 19 (police minimum compensation), and St. 1962, c. 520 (fire fighter minimum compensation), were given first readings and referred to committees by roll call votes of eleven to one. It was voted "to hold the next meeting on Tuesday, November 19, 1963."

At the November 19 meeting the minimum compensation orders were given a second and final reading. See § 25 of the charter. All board members were present. One alderman, who was then acting mayor, could not participate under § 30 of the charter.

On December 3, 1963, the first Tuesday in December, a regular monthly meeting of the board (fn. 3) was held. Letters were received from the mayor. Each letter referred to one of the orders and purported to veto that order in the manner provided by § 27 of the charter (fn. 2). Both orders were passed notwithstanding the mayor's veto. A motion to reconsider the vote in each case was defeated.

On December 11, 1963, a special meeting was called by the mayor for purposes which included certification of the results of the November election. An order ratifying the results was referred to a committee. On December 17, 1963, another board meeting was held. A motion to reconsider the acceptance of the two minimum pay statutes was

---

ter's report did not fully disclose whether the meetings of November 12 and 19, 1963, complied with this rule. There had been prior inaccuracy (involving some of the same parties) in placing before this court the nature of proceedings in Chicopee's city government. See *Minnie* v. *Chicopee,* 344 Mass. 743, 744–745, fns. 2–3. Accordingly, we ordered that the record be supplemented to show the full facts concerning the meetings. This was done by stipulation of counsel approved by the trial judge. It revealed that the record originally filed required amplification.

defeated.   It was voted unanimously to hold the next meeting on December 30, 1963.

On December 18, 1963, two referendum petitions ("protesting" the December 3 orders) were filed with the city clerk by three defendants (the three petitioning voters) all of whom were members of the defendant Chicopee Taxpayers Association, Inc. (fn. 1).   Each of these referendum petitions was signed by over twelve per cent of Chicopee's registered voters.   Other facts concerning this petition are stated in point 2 of this opinion where the effect of the referendum petitions is discussed.   The bills for declaratory relief raised various questions concerning (a) the validity of these referendum petitions and (b) whether the delay in declaring the results of the election held on November 5, 1963, prevented St. 1963, c. 734, from taking effect until too late to permit such referendum petitions.

1.   The first question is whether the two readings given to the orders (accepting the minimum compensation statutes) at the board's meetings on November 12 and 19 were valid final action (subject to the mayor's veto and any available referendum) in view of Rule 1 of the board's rules (fn. 3) placing regular meetings of the board on the first Tuesday of each month and the explicit provisions of § 13 of the charter (a) giving to the mayor the power and duty to call special meetings by written notice, "stating the subjects to be considered thereat," and (b) forbidding "final action" at a special meeting "on any business not stated in such notice."   See McQuillin, Municipal Corporations (3d ed.) §§ 13.08, 13.37; Rhyne, Municipal Law, § 5–5.   The meetings are questioned because neither was held (a) on a day specified in Rule 1 for a regular meeting, or (b) at the call of the mayor.

We think all questions about these two meetings are met by the following considerations.   (1) The November 12 meeting, by unanimous consent of the board of aldermen voted at the meeting on October 22, was held on that day, in lieu of the regular meeting for November (which would normally have been held on November 5, election day).

We think that such unanimous consent permits change, at least in advance of the usual meeting date, of the date set by rule for the regular meeting. It is much the same as if the meeting set for November 5 had been held on that day and then adjourned until November 12. All board members had consented to holding a regular meeting on that day, and had an opportunity to be present and to participate in any action. See *Reilly* v. *Selectmen of Framingham,* 345 Mass. 363, 364–365. See also *Stebbins* v. *Merritt,* 10 Cush. 27, 34; *Re Oxted Motor Co. Ltd.* [1921] 3 K. B. 32, 37, 39. (2) The meeting of November 12, held on that day by unanimous consent, could have been adjourned to November 19, and the adjourned meeting would still have been in effect a regular meeting. In the circumstances, we interpret the vote at the November 12 meeting "to hold the next meeting on . . . November 19" as designed and intended (a) to accomplish something which the board of aldermen lawfully could do without the consent of the mayor, viz. to adjourn the November 12 meeting for a week, rather than (b) to call a new special meeting, action which under § 13 (fn. 2) we assume (without deciding) would have required consent or participation of the mayor. A vote to adjourn or recess the November 12 meeting to the later date, of course, would have avoided doubt and would have been more accurate and appropriate action. See McQuillin, Municipal Corporations (3d ed.), § 13.38. See also *State, ex rel. Rees,* v. *Winchell,* 136 Ohio St. 62, 66.

Accordingly, we hold that final action by the board of aldermen (subject to the mayor's power of veto and to any referendum) on the two pay statute acceptance orders properly did take place at the meeting on November 19. On December 3, 1963, these orders were duly passed over the mayor's veto at the regular meeting of the board of aldermen properly held on that day and became effective subject to any referendum.

2. We turn to the referendum petitions filed on December 18, 1963, with the city clerk, as already stated. If St. 1963, c. 734 (making available in Chicopee the referendum provisions of G. L. c. 43, §§ 37–44), had then been ef-

fectively accepted in Chicopee, the referendum petitions of December 18 were seasonably filed.

(a) After the completion on December 16, 1963, of the last recount of votes cast at the election of November 5, 1963, there were meetings of the board of aldermen on December 17, 20, 23 (two meetings), 27, and 30, 1963. It was not until December 30 that the board adopted an order concerning ratification of the election (i.e. an order declaring its results). The mayor had twice requested earlier action on this declaration.

The board of aldermen were under a duty "forthwith" to declare the votes (see G. L. c. 54, § 137, as amended through St. 1935, c. 55) upon the question submitted to the voters at the November 5, 1963, election. Upon the facts found by the master, the only reasonable inference to be drawn was that there was deliberate delay by the board in announcing the result of the November 5 vote on the question. As to that vote no recount had been sought. This delay caused the declaration (on December 30, 1963) of the November 5 vote to take place after December 23, the last day for filing a referendum petition concerning the board's purported orders of December 3. See G. L. c. 43, § 42 (as amended through St. 1961, c. 550). The last day for asking a recount was November 12, 1963. See G. L. c. 54, § 135, as amended through St. 1963, cc. 234 and 627 (see also later amendments through St. 1966, c. 123, §§ 14, 15).

We need not decide whether, under § 137, the result of the vote on November 5 should (or could) have been declared by the board prior to the completion of other recounts concerning other issues or contests for public office. In any event, there had been public announcement of the result of that vote (see G. L. c. 54, § 105, as amended) followed by the expiration (without a petition for recount) of the period within which a recount petition could be filed with respect to that vote. Deliberate delay does not constitute the "due diligence" contemplated by the word "forthwith." See *Gamwell* v. *Bigley,* 253 Mass. 378, 382; *Commonwealth* v. *Bouchard,* 347 Mass. 418, 420. Particularly is this so in a

matter of public concern. Even after December 16, 1963, when the last recount was completed, there was ample time for such a declaration, and there were several meetings of the board at which the declaration should have been made. Nothing in the record suggests that there was any matter relating to the November 5 vote which gave rise to any area of discretion in the board of aldermen (compare *McLean* v. *Mayor of Holyoke,* 216 Mass. 62, 64, with *Johnson* v. *District Atty. for the No. Dist.* 342 Mass. 212, 214–215), or which made the declaration of the result more than a ministerial act.

Substantive rights of voters cannot thus be thwarted. By a mandamus proceeding action could have been compelled. The purpose of our election statutes is to ascertain, in a sensible and expeditious manner, the will of the voters (see *Abbene* v. *Board of Election Commrs. of Revere,* 348 Mass. 247, 250) and to inform the public promptly about election results. The purpose is not to be obstructed by such tactics. We treat the election declaration of December 30, 1963, as relating back to November 5, 1963, the date of the election. Statute 1963, c. 734, provided that if the November 5 vote was "in the affirmative, this act shall *thereupon* take effect" (emphasis supplied). It did not say that the act would become effective when the board of aldermen got around to declaring the vote.

(b) The petitions for referendum filed on December 18, 1963, within twenty days after the votes of December 3, 1963, were reasonably expressed, as the master in effect found, in a form showing that each signer wished to protest against the orders "taking effect."[4] See G. L. c. 43, § 42 (as amended through St. 1961, c. 550). Minor discrepancies in the form of protest are of no importance.

---

[4] Each petition consists of a face sheet addressed to the board of aldermen, a second sheet which is the certification statement of the board of registrars of voters, and over two hundred mimeographed petition sheets with the protest at the top and spaces for signatures below. These petition sheets do not indicate that they are addressed to the board of aldermen but do state that they are drawn pursuant to G. L. c. 43, § 42. The petition sheets "protest against . . . measure" and do not say in so many words that they protest against the measure "taking effect."

(c) General Laws c. 43, § 38, is set out in the margin.[5]
The procedure in that section applies to referendum peti-
tions under G. L. c. 43, § 42.[6]  The master found that the
petitions were "in conformity with" §§ 38 and 42 "except
in one particular and that is that neither petition contains
the names and addresses of three persons 'designated as
filing the same' as the statute calls for."  There are, how-
ever, three signatures (of the three petitioning voters) on
the face sheet of each petition but these are stated to be
those who "circulated the petition."  The three petition-
ing voters were, as the master found, all present with the
city clerk in his office when the petitions were filed.  Each
of them signed the face sheet of each petition (adding his
address).

We think that having the three petitioning voters sign
the face sheet (adding their addresses) effected compliance
with the italicized words of § 38 (fn. 5) and that this was,

---

[5] Section 38 reads, "Signatures to initiative petitions need not be all on
one paper.  All such papers pertaining to any one measure . . . shall be filed
in the office of the city clerk as one instrument, *with the endorsement thereon
of the names and addresses of three persons designated as filing the same.*
With each signature to the petition shall be stated the place of residence of
the signer, giving the street and number, if any.  Within five days after the
filing of said petition the registrars of voters shall ascertain by what number
of registered voters the petition is signed, and what percentage that number
is of the total number of registered voters, and shall attach thereto their
certificate showing the result of such examination.  The city clerk shall forth-
with transmit the . . . certificate with the said petition to the city council
. . . and at the same time shall send a copy of said certificate to one or more
of the persons designated on the petition as filing the same" (emphasis
supplied).

[6] Section 42 (as amended through St. 1961, c. 550), reads (emphasis sup-
plied), "If, within twenty days after the final passage of any measure, except
a revenue loan order, by the city council . . . a petition signed by registered
voters of the city, equal in number to at least twelve per cent of the total num-
ber of registered voters, and addressed to the city council . . . *protesting
against such measure . . . taking effect,* is filed with the city clerk, the same
shall thereupon . . . be suspended from taking effect; and the city council
. . . shall immediately reconsider such measure . . . and if such measure . . .
is not entirely rescinded, the city council shall submit the same . . . to a vote
of the registered voters of the city, either at the next regular city election, or
at a special election . . . and such measure or part thereof shall forthwith
become null and void unless a majority of the registered voters voting on the
same at such election vote in favor thereof.  The petition described in this
section shall be termed a referendum petition and section thirty-eight shall
apply to the procedure in respect thereto, except that the words 'measure or
part thereof protested against' shall for this purpose be understood to replace
'measure' in said section wherever it may occur, and 'referendum' shall be
understood to replace the word 'initiative' in said section."

or should have been, readily apparent to the city clerk and to the registrars of voters. We hold that what was done was all that was necessary. The usual procedures required by §§ 38 and 42 for submitting to the voters the issues raised by the referendum petitions then should have been followed by the appropriate city officials.

3. The interlocutory and final decrees are reversed. The cases are to be remanded to the Superior Court for further proceedings consistent with this opinion. The Superior Court may retain jurisdiction of these cases until the referenda sought by the petitions filed December 18, 1963, have been held and the results declared. New final decrees are to be entered declaring (1) that St. 1962, c. 520, and St. 1963, c. 19, were accepted by votes of the board of aldermen on December 3, 1963, subject, however, to the possibility of referenda; (2) that the referendum petitions filed December 18, 1963, were seasonably filed and were valid; and (c) that referendum questions concerning the acceptance of St. 1962, c. 520, and St. 1963, c. 19, are to be submitted to the voters at the next municipal election or at a duly called special election.

*So ordered.*