SCHOOL COMMITTEE OF SPRINGFIELD v. BOARD OF EDUCATION.

Hampden. April 4, 1972. — September 7, 1972.

Present: TAURO, C.J., SPIEGEL, REARDON, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Racial Imbalance Law. Education. School and School Committee. Administrative Agency. Jurisdiction,* Administrative agency, Constitutional question. *Statute,* Construction. *Words,* "Forthwith," "Neighborhood," "School district established for his neighborhood."

G. L. c. 71, § 37D, and c. 15, § 1I, together imply that, in appropriate circumstances, the State board of education may revoke its previously granted approval of a plan designed to eliminate racial imbalance. [430–431]

Where the State board of education revoked its prior approval of a plan designed to eliminate racial imbalance, which met all the requirements of G. L. c. 71, § 37D, and had not been judicially declared to violate any constitutional guaranty, solely on the basis of an unsupported statement that the school building program aspect of the plan might "burden black parents and children disproportionately," the revocation and subsequent withholding of

State financial aid to the committee submitting the plan was beyond the statutory powers conferred upon the board. [431–432]

G. L. c. 71, § 37D, permits a school committee to use short-term as well as long-term methods to eliminate racial imbalance in its schools and, read with G. L. c. 15, § 1I, and the preamble to the racial imbalance law, empowers the State board of education to require a school committee, governing schools where imbalance has existed for a period of years, to formulate short-term racial balance plans pending the completion of a long range building program designed to eliminate racial imbalance [432–434]; but failure of such a committee to submit to the board acceptable short-term plans did not empower the board to authorize the commissioner of education, under § 1I, to withhold State financial assistance to that committee where the board had, by offering the committee a choice of three optional short-term proposals, failed to meet its own statutory obligations under 1I, which requires the board to make a single specific proposal for an acceptable plan [434–436].

Where sections of different chapters of the General Laws are enacted by the same legislative bill, they should be construed together. [433]

The phrase "school district established for . . . [a pupil's] neighborhood" appearing in G. L. c. 71, § 37D, means an attendance district which a school committee has presently chosen to establish and not the school district established prior to the effective date of the racial imbalance law in 1965, so that the provision of that section, that "No school committee . . . shall be required as a part of its plan to transport any pupil . . . to any school outside the school district established for his neighborhood, if the parent or guardian of such pupil files written objection thereto," does not give the parent the right to veto transportation of his child to a school which was not in his attendance district in 1965. [436–438]

The provision of G. L. c. 71, § 37D, concerning transportation of a pupil outside his neighborhood school district where there is objection thereto forbids the school committee to establish excessively large or gerrymandered districts; the committee's discretion to redistrict school attendance areas is also limited by the provisions of § 37D, obligating the committee to establish school districts "for . . . neighborhoods[s]" and to consider safety "on an equal basis" with racial balance. [438–440]

G. L. c. 15, § 1I, indicates that the State board of education must accept a plan designed to eliminate racial imbalance formulated by a school committee if the plan reasonably appears to be designed to achieve racial balance and otherwise complies with G. L. c. 71, § 37D. [440–441]

Upon review of a school committee's plan formulated under the State racial imbalance law, the State board of education and the courts are bound by the committee's factual determinations if they are supported by substantial evidence. [441–442]

Where a school committee had failed to achieve racial balance over a period of years the committee, with assistance, pursuant to G. L. c. 15, § 1I, para. 1, from the State board of education, was obligated to develop appropriate short-term measures, consistent with G. L. c. 71, § 37D, designed to eliminate racial imbalance by the beginning of the next academic year. [444]

AMENDED SUBSTITUTE BILL for judicial review filed in the Superior Court on July 28, 1971.

The suit was reserved and reported by *Bennett, J.*

*Troy T. Murray*, City Solicitor (*James Dowe* with him) for the plaintiff.

*William E. Searson, III*, Special Assistant Attorney General (*Walter H. Mayo, III*, Assistant Attorney General, with him) for the defendant.

*William F. Malloy* for Neighborhood Legal Services of Springfield, Inc., amicus curiae, submitted a brief.

TAURO, C.J.    The plaintiff school committee seeks an order directing the defendant State board of education (board) to release certain State school aid withheld from its use under the provisions of the racial imbalance law.[1] By way of counterclaim to the school committee's amended substitute bill for judicial review, the board prays that the school committee be ordered to adopt one of three racial balance plans, as per the board's decision of May 25, 1971, and that additional State school aid be ordered withheld pending compliance with the board's May 25th decision.

The case is here upon the reservation and report of a judge of the Superior Court under G. L. c. 214, § 31. See G. L. c. 213, § 1B, as amended by St. 1962, c. 722, § 4. The parties' statement of agreed facts, including 108 exhibits, may be summarized as follows.

Since October, 1965, the school committee has annually provided the board with statistics setting forth the percentage of nonwhite students in each public school under its supervision. The board determined, on the basis of

---

[1] The law, first enacted in 1965 and subsequently amended, is found in General Laws c. 15, §§ 1I–1K, and c. 71, §§ 37C, 37D. See St. 1965, c. 641; St. 1966, c. 14, § 41; St. 1969, c. 643; St. 1971, c. 958. For a summary of the respective duties and functions of school committees and the board under the law, see *School Comm. of Boston* v. *Board of Educ.* 352 Mass. 693, 695–696. See also notes, 46 B. U. L. Rev. 45, 64–82, and 5 Harv. J. Legis. 83, 88–100, 113–116. See generally Kotin, Equal Educational Opportunity; The Emerging Role of the State Board of Education, 50 B. U. L. Rev. 211.

the 1965 statistics, that racial imbalance[2] existed in one junior high school and six elementary schools in Springfield. On April 1, 1966, to correct this imbalance, the school committee filed with the board a racial balance plan based on the recommendations of the board's own advisory committee (See G. L. c. 15, § 1K). This first plan provided, inter alia, for closing of one elementary school; alteration of school attendance districts; modification of the city's open enrollment program; and construction of one new elementary school and an addition to an existing junior high school. The board promptly approved the plan on April 12, 1966.

Statistics filed by the school committee in October, 1966, showed that, despite the short term measures taken under the first plan, there remained one imbalanced junior high school and five imbalanced elementary schools in the city. A second plan was then submitted to the board in July, 1967. The commissioner of education (commissioner), as executive head of the board, notified the school committee in a letter dated July 31, 1967, that the board regarded the plan as weak and it recommended certain changes in the plan. An impasse developed but was resolved with the submission of a revised second plan in September, 1967, which the board approved on October 24, 1967. The revised second plan contained the following elements: continuation of the modified open enrollment program; appointment of a director of school

---

[2] General Laws c. 71, § 37D, defines the term as follows: " '[R]acial imbalance' refers to a ratio between nonwhite and other students in public schools which is sharply out of balance with the racial composition of the society in which nonwhite children study, serve and work. For the purpose of this section, racial imbalance shall be deemed to exist when the per cent of nonwhite students in any public school is in excess of fifty per cent of the total number of students in such school." Compare 42 U. S. C. § 2000c (b) (1970). In ascertaining the extent of racial imbalance in Springfield, it appears that the board has relied exclusively upon the quantitative measure of imbalance contained in the second sentence of the definition. No issue is presented here as to what responsibilities, if any, the first sentence may place upon the board or upon school committees. See Notes, 46 B. U. L. Rev. 45, 70–71 and 5 Harv. J. Legis. 83, 83–95.

community relations; creation of a METCO[3] program in the Springfield metropolitan area; further alteration of school attendance districts; phasing out of grades 5 and 6 at two elementary schools; and construction of three new elementary schools and an addition to one existing junior high school.

The October, 1967, statistical survey revealed continued imbalance at six schools in Springfield. Thereafter, on December 7, 1967, the board requested a detailed progress report on steps being taken to implement the second revised plan. The city's superintendent of schools responded on January 9, 1968, that only six white, and 171 nonwhite, students were participating in the open enrollment program and that, even with revised school attendance districts, the six schools remained racially imbalanced. No further action, however, was taken by the board until late 1968 when new annual statistics indicated that, despite the closing of the one imbalanced junior high school, racial imbalance continued to exist at five schools — all elementary. The board then required a new plan, and the school committee complied on March 17, 1969. The third plan, approved by the board on July 22, 1969, concluded as follows: "Racial balance can be maintained in all the new school complexes and in all new elementary schools of Springfield when the new facilities are available." In substance, the plan was similar to the revised second plan and, like that plan, placed greatest emphasis on school construction to achieve balance.

---

[3] METCO is the Metropolitan Council for Educational Opportunity which conducts a program designed to give urban children the opportunity to attend suburban schools. Funds for this purpose are provided for by statute. See G. L. c. 76, § 12A, inserted by St. 1966, c. 506, which reads in pertinent part as follows: "Any child residing in any town and attending therein a public school in which racial imbalance, as defined in . . . [G. L. c. 71, § 37D] exists, may attend a public school of a town in which he does not reside, providing the school committee of such town has adopted, and the state board of education has approved, a plan for the attendance of nonresident children in such town . . . . The state board of education . . . shall provide financial assistance to any town which adopts a plan for the elimination of racial imbalance in other towns."

By October, 1969, the annual statistical census revealed that five schools still remained racially imbalanced, and on February 26, 1970, the board requested the school committee to submit an updated version of its third plan. The board further requested information concerning the effect of pupil transfers upon imbalance and any progress made toward the construction of new schools. The school committee provided this information in a letter dated April 1, 1970, but it did not submit an updated plan. On June 12, 1970, the commissioner notified the committee by letter that the board had unanimously passed the following resolution: "That the [s]chool [c]ommittee and . . . [its chairman] be put on notice immediately that their failure to comply with the racial imbalance law will result in . . . [the withholding of State school aid]." Notwithstanding the resolution, however, agents of the board (principally the assistant commissioner of education) held discussions with the school committee throughout the summer and fall of 1970, and at least with respect to the committee's proposed building program, the board encouraged the committee to proceed with its third plan, without revision.

The statistical survey made in October, 1970, as in the year before, showed that there were five racially imbalanced elementary schools. No indication was given by the board that a new or revised plan would be required, but on December 1, 1970, the commissioner wrote to the mayor of Springfield, as chairman of the school committee, that the board had requested a final recommendation on whether it should vote to withhold State school aid from Springfield. The commissioner further stated that his recommendation would depend, in part, upon information received regarding new school construction and on the implementation of short term measures. Upon receipt of the commissioner's letter, the mayor promptly forwarded to the commissioner copies of executed architectural contracts for all proposed school construction projects, and in a separate letter, he

outlined the city's progress, as well as its problems, in trying to achieve racial balance.

The commissioner's response was a letter dated December 11, 1970, in which he stated as follows: "It appears from the information available to me that the [school construction] projects described in your letter will, upon their completion — and assuming that demographic factors remain relatively constant, eliminate racially imbalanced schools from the Springfield system. Therefore, although I have not considered . . . preferable long-range alternatives . . . , I believe that the [city's racial balance] plan complies with the requirements of the Act. . . . I note, however, that implementation of the plan remains contingent upon certain actions . . . [which must be] taken by you and the City Council." [4]

The letter continued: "Consequently, I have concluded that, until all actions have been taken to make the system's commitment to its present long-range plan an unqualified one, the Springfield system will not have shown progress within a reasonable time in eliminating racial imbalance in its schools. For . . . [this] reason, . . . I will recommend to the [b]oard of [e]ducation that they instruct me to notify . . . [the appropriate State officials to defer payment of any school assistance to Springfield until] . . . the aforementioned contingencies have been fulfilled." In addition, the letter indicated: "My [second] recommendation will . . . [be] that . . . [, in any event, you must develop interim measures to eliminate racial imbalance by September, 1971, pending completion of all new schools, and if an acceptable proposal is not] received . . . by April 1, 1971, I shall feel constrained to advise the appropriate State officials at that time to defer any further payments of State monies."

At its December 15th meeting, the board voted a

---

[4] The action referred to was the appropriation of sufficient funds to meet the city's obligations under the architectural contracts enclosed in the mayor's last letter. The mayor's view that $150,000 would be adequate to cover the preparation of drawings was apparently acquiesced in by the commissioner.

resolution adopting the commissioner's recommendations in full; however, no action was taken to withhold money from Springfield until January 4, 1971. The commissioner on that date certified the share of State School assistance due each city and town in the Commonwealth, but he placed the following notation next to Springfield's line: "Springfield not in compliance with the provisions of . . . [the racial imbalance law]; therefore, [the] State [b]oard of [e]ducation is withholding said funds until compliance." The amount thereby withheld was approximately 7.4 million dollars.[5]

Subsequent to the board's vote, but before the commissioner's action, the commissioner received a letter dated December 26, 1970, from a representative of "People Take Action," a black community organization, in which the writer expressed opposition to the school construction aspect of Springfield's racial balance plan. The gist of the objection was that certain schools within the black community were to be phased out without any replacement, and as a consequence, black children would have to attend schools outside their community, thereby placing the burden of achieving racial balance primarily on blacks. To eliminate this feature of the plan, the letter recommended alteration of Springfield's building program, and it suggested that, without alteration, the plan might be subject to constitutional attack as violating the equal protection clause of the

---

[5] The mechanics of withholding are as follows: In order to determine the amount of State school aid due a particular city or town, it is necessary for State fiscal authorities to have certain school attendance figures from the commissioner. G. L. c. 70, §§ 2, 4, 5. See also G. L. c. 72, § 2A. The fifth paragraph of c. 70, § 5, as appearing in St. 1966, c. 14, § 40, provides: "The number of school children . . . shall be subject to approval, verification and adjustment by the commissioner." In ordinary circumstances, the commissioner would merely certify, with appropriate adjustment, the figures provided him by local school officials (ibid), but if a city or town has not shown "progress within a reasonable time in eliminating racial imbalance," the commissioner is directed not to make the necessary certification. As a discretionary matter, he may also notify State fiscal authorities to hold any funds previously certified but not yet disbursed to the city or town. G. L. c. 15, § 1I, second paragraph.

Fourteenth Amendment to the Constitution of the United States.

Within a few days of receipt of this letter, the commissioner wrote the mayor on December 31, 1970, as follows: "Since . . . [my last letter to you on December 11, 1970,] I have reviewed the transcripts of this . . . [department's hearing] in Springfield,[6] and recent communications from citizens groups . . . that relate to the location of proposed schools. . . . [Upon consideration of these factors,] it is increasingly clear to me that, in the development of its long-range racial balance plan, your [s]chool [c]ommittee must operate fairly and equally, to the extent possible, on all segments of the affected community. . . . [A]ny inconvenience to pupils and parents . . . should be shared equitably by the entire community. Therefore . . . I now advise that you must incorporate the considerations to which I refer in any long-range planning."

Subsequent to this letter, and after State aid had been withheld, the Springfield city council on January 18, 1971, appropriated $150,000 toward the preparation of architectural drawings for the new schools contemplated by the city's racial balance plan. State aid, however, was not released, although the appropriation met the contingency set by the board in its December 15th vote. The commissioner in a letter dated January 20, 1971, acknowledged the city's action, but he reiterated his position of December 31, 1970: "[As I indicated previously,] this [d]epartment, on the basis of continuing legal developments, . . . questions whether your plans . . . satisfy present legal requirements. Therefore, . . . I must advise you again . . . that your present long-

---

[6] The hearing referred to was held on November 30, 1970, by the board's advisory committee on racial imbalance. See G. L. c. 15, § 1K. The announced purpose was to receive testimony "to assist the . . . [committee] in some stocktaking [of the city's progress under the racial imbalance law]." Of seventeen witnesses, five made essentially the same criticism of the Springfield plan as stated in the "People Take Action" letter of December 26, 1970.

range plan is not now acceptable." The commissioner noted further that the letter should not be construed as excusing the school committee from the requirement that an acceptable short-range proposal be submitted by April 1, 1971.

On January 26, 1971, in another letter on the subject, the commissioner indicated that the board had ratified his position and had reached certain additional "conclusions." These were that, while planning and construction of one elementary school might continue, planning for the two other elementary schools should be discontinued pending a thorough review by a joint city-State task force. The reason given for "suspension" of planning was that the site of one school "would appear to burden [b]lack parents and children disproportionately" and that the site of a second school was also questionable on this score.[7] The letter also indicated: "[P]lans that involve the building of new schools and the closing of existing ones should take into account the factors of convenience and fairness to the entire community . . . as well as factors of educational quality and the elimination of racial imbalance." Until such planning was undertaken, the commissioner stated, the school committee could not expect the release of State school assistance.

Notwithstanding this letter, on February 5, 1971, the commissioner and the school committee entered into a stipulation, whereby the commissioner withdrew notice of the city's noncompliance with the racial imbalance

---

[7] The board's conclusions appear to follow the reasoning of its task force on racial imbalance which, on January 25, 1971, indicated as follows in a memorandum to the commissioner: "It is . . . clear . . . that the proposed North Branch School, considered in light of the closings of schools in the black community with the resulting inconvenience primarily upon those parents and children, and the apparent availability of alternative sites that would be less onerous to those citizens, would not satisfy applicable legal criteria. That is, that aspect of the present plan, even if it resulted in a racially balanced school, might well violate the Federal 14th Amendment by disportionately burdening black children and parents." As to the other new schools proposed under the Springfield plan, the task force stated that one school caused no problems in this regard, but that the other might also be objectionable on constitutional grounds, although it met all requirements of the racial imbalance act.

law. As a result, the funds withheld in January, 1971, were released to the city. It was also stipulated, however, that the release "in no way affects or prejudices the rights of either party in the case . . . [or] the [c]ommissioner's rights with respect to events which have occurred subsequent to December 15, 1970."

The commissioner wrote to the superintendent of schools on February 12, 1971, that it was his understanding that the stipulation had no effect on the April 1st deadline for submission of a short-range proposal. Subsequently, after consultations with the commissioner's staff, the city school department recommended that the school committee adopt any one of three short-term measures. The school department's report bears the date March 9, 1971.

The first option proposed was a "[c]luster [p]lan" involving the five imbalanced schools and seventeen other schools. There would be five clusters, each containing four or five schools, with students mixed between the schools in such a way as to achieve racial balance. The second option was "[g]rouping" involving fifteen schools, the five imbalanced schools and ten others. This method would require the matching of "each of the racially imbalanced schools with two schools which now have a relatively low percent of non-white pupils. Kindergarten through grade two . . . [would] be in one school, grades three and four in another school, and grades five and six in the third school." The third option was the "[p]airing" of each racially imbalanced school with another school. One school of each pair would have the primary grades (K to 3), and the other school, the intermediate grades (4 to 6). Each of the options would involve bussing of students, at a cost of $397,500 for the first option, $771,719 for the second option, and $449,240 for the third option.

On March 23, 1971, in anticipation that one of the options would be acceptable to the school committee, the board voted to extend the deadline for development of a short-range proposal from April 1 to May 18, 1971.

However, on May 6, 1971, the school committee, by a four to three majority, refused to adopt any of the measures recommended by its staff. Subsequently, on May 25, 1971, the board voted the following resolutions: "[1.] The [b]oard of [e]ducation finds that the Springfield [s]chool [c]ommittee is not in compliance with the [b]oard's requirements of December 15, 1970 . . . . The [b]oard reinvites the attention of the [s]chool [c]ommittee to the three plans developed by Springfield [s]chool [d]epartment . . . dated March 9, 1971. . . . [2.] [I]n view of the failure of the Springfield [s]chool [c]ommittee to comply with . . . [the racial imbalance law] the [c]ommissioner is directed to immediately notify . . . [the appropriate State officials to withhold State school assistance from the city.]"[8]

In accordance with the board's vote, the commissioner immediately sent letters to the State comptroller and the State commissioner of corporations and taxation directing them to make no further disbursements from the money released under the stipulation of February 5, 1971, between the commissioner and the school committee. These funds remain in the State treasury pending a decision by this court.

1. It is well to note, as a preliminary matter, the nature of the issues before this court and the scope of today's decision.

By virtue of the racial imbalance law, it is the policy of this State "to encourage all school committees to adopt as educational objectives the promotion of racial balance and the correction of existing racial imbalance in the public schools." G. L. c. 71, § 37C. Compare 42 U. S. C. §§ 2000c (b), 2000c–6 (1970). The Supreme Court of the United States has emphasized the constitutional necessity of eliminating "all vestiges of state-imposed segregation." At the same time, however, it

[8] Included in the board's vote was also an offer to release State school assistance on June 11, 1971, if in the meantime the school committee were to adopt "one of . . . [the three] plans or . . . [an equally effective] variation [thereof]." The committee, however, chose instead to pursue judicial review of the board's decision.

has also indicated that racial balance is not required by the Federal Constitution, although a State may, in its discretion, adopt a policy of achieving racial balance in its public schools. *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* 402 U. S. 1, 15–16.[9] See *United States* v. *Montgomery County Bd. of Educ.* 395 U. S. 225, 236 (quoting from the brief submitted for the United States). See also *School Comm. of Boston* v. *Board of Educ.* 352 Mass. 693, 698, app. dism. 389 U. S. 572.

The principal issues which the parties have argued before this court concern the extent of the board's powers and jurisdiction under the racial imbalance law. Since there is no claim here that Springfield maintains a dual system of "racially separated school[s]" in violation of the mandate in *Brown* v. *Board of Educ. of Topeka,* 347 U. S. 483; *S. C.* 349 U. S. 294, our present concern is the interpretation and enforcement of the provisions of the Massachusetts racial imbalance act. Compare *Swann* v. *Charlotte-Mecklenburg Bd. of Educ., supra,* at 14.[10] Although the issue of State imposed

---

[9] In the *Swann* case, the controversy concerned the elimination of a dual school system maintained by school authorities in a North Carolina county. The court held (at 15) that, where such State-imposed segregation has existed, the objective must be "to convert to a unitary system." See *Green* v. *County Sch. Bd. of New Kent County,* 391 U. S. 430. But the court continued (*Swann,* at 16): "In seeking to define even in broad and general terms how far . . . [the] remedial power [of Federal Courts] extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. . . . School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students . . . . To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court." Moreover, it is perhaps also significant that the court indicated no disagreement with 42 U. S. C. § 2000c-6 (1970), which expressly disclaims any intention to create a Federal right of action for "so-called 'de-facto segregation,' where racial imbalance exists . . . but with no showing that this was brought about by discriminatory action of state authorities." See pp. 17–18. See also pp. 22–23; *Wright* v. *Council of Emporia,* 407 U. S. 451, 465, 473, 474.

[10] In the *Swann* case a unanimous Supreme Court stated (at 28): "Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. . . ." See also fn. 9, *supra.*

segregation is not before us on the present record, we believe that, if racial balance is the objective, our disposition of this case may lead to a plan which not only satisfies State law but also may eliminate any claim of unconstitutional racial discrimination in Springfield's public schools. See *Barksdale* v. *Springfield Sch. Comm.* 237 F. Supp. 543 (D. Mass.) ; *S. C.* sub nom. *Springfield Sch. Comm.* v. *Barksdale*, 348 F. 2d 261 (1st Cir.).[11]

2. With these preliminary observations, we turn now to the amended substitute bill for judicial review brought under G. L. c. 15, § 1J, first paragraph.[12]

Initially, the commissioner withheld State school assistance from Springfield on the ground that the city had not demonstrated an "unqualified" commitment to implement its third racial balance plan. It appears from the record, however, that, on January 26, 1971, the board revoked its prior approval of the plan and authorized continued withholding of funds because of an alleged deficiency in the plan's building program.

While there is no express indication in G. L. c. 15, § 1I, that the board may revoke a previously approved plan, either in whole or in part, such authority is implied in appropriate circumstances because of the power to ap-

---

[11] From an amicus brief filed in the instant case by Neighborhood Legal Services of Springfield, Inc., it appears that certain individuals and organizations from Springfield's black community have brought a second suit which is now pending in the Federal District Court for Massachusetts. *Maness* v. *Springfield Sch. Comm.*, Civil Action No. 71–143–M (D. Mass.).

[12] While a bill under this section will clearly lie to review the board's rejection of a racial imbalance plan, there is a serious question, raised by the board, whether c. 15, § 1J, first paragraph, is also a proper vehicle for obtaining review of the withholding of State school assistance. We have indicated recently, however, that procedural niceties should not be a barrier to judicial review where substantial issues of law are at issue. *Reading* v. *Attorney Gen. ante* 266, 269–270. Although the committee could have brought a petition for certiorari or a bill for declaratory relief to review the commissioner's withholding orders (*id.* at 269–271), consistent with the policy announced in the *Reading* case, we construe the amended substitute bill according to its nature and substance, and not its form. See *Essex Trust Co.* v. *Averill*, 321 Mass. 68, 70; *Employers' Liab. Assur. Co. Ltd.* v. *Traynor*, 354 Mass. 763. There is no need for further amendment of the bill since the merits have been argued before us. Compare *Reading* v. *Attorney Gen., supra,* at 271.

prove or disapprove plans.   Moreover, it is significant that, under G. L. c. 71, § 37D, "[w]henever the state board of education finds that racial imbalance exists in a public school" (emphasis supplied), it must require submission of a plan which will correct the imbalance.   On the basis of these provisions, we are satisfied that the board may, in appropriate circumstances, revoke a previously granted approval.   Cf. *Multi-Line Ins. Rating Bureau* v. *Commissioner of Ins.* 357 Mass. 19, 22, and cases cited.

It is clear in the instant case that the circumstances were not appropriate for the exercise of this power.   As the commissioner's letter of January 26, 1971, plainly states, the sole reason for the board's action was that, in achieving racial balance, the Springfield school building program might "burden [b]lack parents and children disproportionately."   There is no evidence in the record which indicates that the city's program to construct new schools would operate in a discriminatory fashion.[13] Where, as here, it is acknowledged that a plan meets all requirements of G. L. c. 71, §37D, and it has not been established that a plan violates a constitutional guaranty, there is no basis for administrative action against the city.   See G. L. c. 15, § 1I, first paragraph.   While we recognize that compliance with the statute does not necessarily satisfy the constitutional guaranty of equal protection, it is fundamental in our system of government that courts, and not administrative agencies, must resolve *conflicts* which may arise between statutory and constitutional provisions.   Massachusetts Constitution, Declaration of Rights, art. 30.   See *Panitz* v. *District*

---

[13] In this connection, the board directs our attention to the "People Take Action" letter of December 26, 1970, the commissioner's letter of January 26, 1971, and the memorandum dated January 25, 1971, from the State task force on racial imbalance to the commissioner. None of these documents however, contains any statistics bearing on the question whether the new school sites would be significantly more burdensome upon blacks than on whites.   Nor are we able even to ascertain from these documents the location of the proposed new schools in relation to areas of black and white concentration in the city.   The record is unsatisfactory in this regard.

*of Columbia,* 112 F. 2d 39, 41–42 (D. C. Cir.) ; Davis, Administrative Law, § 20.04, p. 74. Cf. *Bearce* v. *Zoning Bd. of Appeals of Brockton,* 351 Mass. 316, 319–320.

Since the board was created by the Legislature (see G. L. c. 15, § 1E), it has "only the powers, duties and obligations expressly conferred upon it by . . . statute . . . or such as are reasonably necessary . . . [to carry out] the purpose for which it was established." *Hathaway Bakeries, Inc.* v. *Labor Relations Commn.* 316 Mass. 136, 141, and cases cited. In the instant case, if the board had doubts or was concerned about the constitutionality of the Springfield plan, its appropriate remedy was to seek declaratory relief under G. L. c. 231A. See G. L. c. 71, § 37D, seventh paragraph. See also *School Comm. of Boston* v. *Board of Educ.* 352 Mass. 693, 696–697; *Wachusett Regional Sch. Dist. Comm.* v. *Erickson,* 353 Mass. 77, 79–80. The board had no authority to take the action it did in the absence of a judicial declaration of a constitutional violation. In these circumstances, it was plainly error to continue withholding State school assistance past January 26, 1971.

Apart from this matter, the board argues that, in any event, after May 25, 1971, it had ample ground to withhold the city's share of State school funds because of the school committee's failure by that date to submit an acceptable short-term proposal.

Inasmuch as G. L. c. 71, § 37D, expressly mentions alteration of school attendance districts and transportation of pupils in connection with racial balance plans, there can be no doubt that a school committee under the section may utilize short-term as well as long-term methods of eliminating racial imbalance.[14] See also G. L. c. 71, § 37C. While the language of c. 71, § 37D, further

[14] The school committee's contention that there may be only one plan ignores this statutory language concerning interim measures. We note that the committee has itself relied on both short-term and long-term measures in its various racial balance plans from 1965 to 1970. This consistent administrative practice under the statute is additional support for the view that a plan may have both long-term and short-term features consistent with G. L. c. 71, § 37D. See footnote 21, *infra; Cleary* v. *Cardullo's, Inc.* 347 Mass. 337, 343, 345.

suggests that the Legislature meant to allow school committees a large measure of discretion in the selection of appropriate means, we think that the board also has responsibilities in this regard by virtue of G. L. c. 15, § 1I. Since this section and c. 71, § 37D, were enacted as part of the same bill, they should be construed together. See *Platt* v. *Commonwealth*, 256 Mass. 539, 542; *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686, 698–699. Pertinent here is the board's power under the second paragraph of c. 15, § 1I, to require a school committee to show "progress within a reasonable time in eliminating racial imbalance." A a necessary incident of this power, it would seem that, where a plan to correct imbalance involves construction of new schools over several years, the board must be able to require the city or town to formulate effective measures to deal with racial imbalance in the intervening period.[15] Cf. *Attorney Gen.* v. *Brissenden*, 271 Mass. 172, 177–178.

In the instant case, by December, 1970, after five years under the racial imbalance law, the school committee had still not achieved racial balance in five elementary schools, although it had succeeded in eliminating imbalance in its junior high school system. It is uncontested that, without new interim measures, imbalance would have continued in the elementary school system until at least the 1973–1974 school year when the city expected to complete its building program. In these circumstances, it was clearly proper for the board on

---

[15] A further consideration is the preamble of the racial imbalance law which states: "Whereas, the deferred operation of this act would tend to defeat its purpose, which is to eliminate *forthwith* racial imbalance in the public schools, therefore, it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience" (emphasis supplied) St. 1965, c. 641. The use of the word "forthwith," employed in its ordinary sense (see G. L. c. 4, § 6, Third), dictates the accomplishment of the legislative object without delay, with reasonable diligence and dispatch. See *Lefleur* v. *Chicopee*, 352 Mass. 746, 752–753; *Gifford* v. *Spehr*, 358 Mass. 658, 660–662. See also Black's Law Dictionary (Rev. 4th ed.) 782. The board would be remiss in its responsibilities, if it did not take this requirement into account when assessing the performance of school committees.

December 15, 1970, to direct the school committee to amend its third plan to ensure elimination of racial imbalance during the 1971–1972 school year.

While the board properly required the school committee to include new short-term measures in its plan, this step alone did not satisfy the board's responsibilities. Under G. L. c. 15, 1I, first paragraph, the board initially must "provide technical and other assistance in the formulation . . . of [racial balance] plans," and secondly, if a plan meeting the statutory requirements is not filed, the board must "consult with and make specific recommendations for a[n acceptable] plan by . . . [the] school committee." See the brief by the board at 7–8, filed in *School Comm. of Boston* v. *Board of Educ.* 352 Mass. 693. See also note, 5 Harv. J. Legis, 83, 90.

There is no dispute that the board met its first responsibility. This was accomplished in February and March, 1971, when the commissioner's staff assisted the city school department in the development of three short-term options for the school committee's consideration. The school committee contends, however, that the board did not fulfill its second responsibility of consultation and advice which arose in May, 1971, when the committee failed to file an acceptable plan. See G. L. c. 15, § 1I, first paragraph.

The facts support the committee's contention. There is nothing in the present record to indicate an offer of consultation by the board after the committee's failure to file a plan.[16] Further, while it is true that the board

---

[16] We agree with the statement of the school committee in its brief as to the importance of consultation: "Had there been a consultation with the [c]ommittee as required by the statute . . . it is entirely possible that a meeting of the minds might have resulted to effect a workable compromise between the construction method and the massive busing method to eliminate racial imbalance in Springfield. Had there been a consultation with the [c]ommittee after May of 1971, the [b]oard might have been convinced of the necessity for an in-depth survey to alleviate the [c]ommittee's concern about the workability of any massive busing plan and agreed with the [c]ommittee . . . to consider extending the time to implement a busing plan from September of 1971 to September of 1972. . . . In short, it is the [c]ommittee's con-

did indicate it could accept any of the three optional proposals or a variation thereof, this action did not meet the requirement of "specific recommendations for a[n acceptable] plan." The Legislature must have had more in mind when it used both the word "specific" and the phrase "recommendations for a plan" in the first paragraph of G. L. c. 15, § 1I. See *Republic Cas. Co.* v. *Scandinavian-American Bank,* 2 F. 2d 113, 114 (W. D. Wash.). See also *Whittemore* v. *Town Clerk of Falmouth,* 299 Mass. 64, 68–69. This view is borne out by the first paragraph of G. L. c. 15, § 1J, which provides that, upon judicial review, the court is to enforce the board's recommendations if they satisfy the requirements of the racial imbalance law. It can hardly have been intended, however, that the court should have to pick among several options, for this is not the function of a court in reviewing administrative action. It was clearly the intention of the Legislature that the board should make a single proposal in order to assist the school committee. An obvious concern of the Legislature in making this requirement was the important objective of facilitating the acceptance of a plan by the affected public.

For these reasons, we think that the board should have recommended just one proposal, and not three proposals and any number of possible variations. It is not intended that the board can now end the dispute and resolve all the attendant problems by recommending one of the three proposals. Other issues have now surfaced which require action as will appear later in this opinion (see points 3–5, *infra*).

If the board did not fulfil its own responsibilities under the first paragraph of G. L. c. 15, § 1I, it follows that it had no right under the second paragraph of the section to authorize the commissioner to withhold State

viction that if the [b]oard had exercised its responsibility to consult with the [c]ommittee, as required by the [r]acial [i]mbalance [l]aw, this matter would not be before this court at this time."

school assistance.[17]  Aside from the case of a failure to make a reasonable progress toward the implementation of an approved plan, the language of the statute indicates only two instances where the commissioner may withhold State aid: (1) when a school committee rejects the board's specific recommendations for a plan; or (2) after specific recommendations have been made, the board rejects the school committee's revised plan.  G. L. c. 15, § 1I, second paragraph, § 1J, first paragraph.  In the instant case, since matters had not reached this stage, the board clearly exceeded its authority in directing the suspension of State school assistance.

For these reasons, we conclude that the monies withheld from Springfield should be released.  Our action is meant in no way to relieve either party of the duty of eliminating racial imbalance in a timely fashion.  We shall consider this matter further in connection with the board's counterclaim.

3. Before we deal with the counterclaim, it is appropriate to treat the school committee's request for an expression of our views as to the extent school attendance districts may be altered, and pupils transported, to eliminate racial imbalance.  See G. L. c. 71, § 37D, second and fourth paragraphs.  The issue has been argued by both parties and is clearly essential to the development of acceptable short-term measures.  We

---

[17] The school committee argues that, in any event, the board has no power to withhold State funds without first obtaining a decree from a court under G. L. c. 15, § 1J, second paragraph.  This contention has no merit.  General Laws, c. 15, § 1G, enacted during the same legislative session as the racial imbalance law (see St. 1965, c. 572, § 2; c. 641), states in clear and unambiguous terms: "The board may withhold state and federal funds from school committees which fail to comply with the provisions of law relative to the operation of the public schools . . . ."  Consistent with this section, G. L. c. 15, § 1I, directs the commissioner not to certify State school assistance to any city or town which has failed to make progress within a reasonable time in eliminating racial imbalance.  See fn. 5, *supra*.  It follows from both provisions that, far from restricting the administrative agency's power to cut off funds to a school committee, § 1J merely places an additional method of accomplishing this end in the hands of the board.  See *Doliner* v. *Planning Bd. of Millis*, 343 Mass. 1, 5; *Town Crier, Inc.* v. *Chief of Police of Weston*, 361 Mass. 682, 688, and cases cited (statutes governing the same subject matter, if possible, should be construed to form a consistent and harmonious whole).

express our views on the matter because judicial guidance may "expedite the disposition of this and possible future litigation."[18]   *Goldblatt* v. *Corporation Counsel of Boston,* 360 Mass. 660, 665.   See *Wellesley College* v. *Attorney Gen.* 313 Mass. 722, 731.

The pertinent portion of the statute reads as follows: "[Every racial balance] plan shall, [inter alia], detail the changes in existing school attendance districts . . . . Any plan to detail changes in existing school attendance districts . . . with the intention of reducing or eliminating racial imbalance, must take into consideration on an equal basis with the above-mentioned intention, the safety of the children involved in travelling from home to school and school to home. . . .

*"No school committee . . . shall be required* as part of its plan *to transport any pupil . . .* to any school *outside the school district established for his neighborhood, if the parent or guardian of such pupil files written objection thereto* with such school committee" (emphasis supplied).   G. L. c. 71, § 37D, second and fourth paragraphs.

We do not accept the school committee's contention that the emphasized language gives a parent the right to veto transportation of his child to any school which was not in his attendance district in 1965 when the statute was enacted.   The words of the two quoted paragraphs, as a whole, clearly indicate a legislative intention to permit the alteration of district boundaries as a means of achieving racial balance.   Construed in this light, the phrase "school district established for his neighborhood" means the attendance district which the school committee has chosen to establish for a pupil's neighborhood. See *Industrial Technical Schs. Inc.* v. *Commissioner of Educ.* 330 Mass. 622, 626.   This would also seem to be the plain and ordinary meaning of the phrase.   See

---

[18] It is to be noted that our discussion is not related to transportation of students under a court order where a constitutional violation has been established under *Brown* v. *Board of Educ. of Topeka,* 347 U. S. 483; *S.C.* 349 U. S. 294.   See *Wright* v. *Council of Emporia,* 407 U. S. 451.

*Commonwealth* v. *Thomas*, 359 Mass. 386, 387, and cases cited; G. L. c. 4, § 6, Third.

While the language is not open to the interpretation urged by the school committee, the restriction upon involuntary bussing must be read, at least to some degree, as placing a limitation upon redistricting as well as upon transportation policies. It is a firm rule of statutory construction that, in so far as the language used permits, every major provision of an enactment will be interpreted to make it an effectual part of the whole legislation. See *Atlas Distrib. Co.* v. *Alcoholic Beverages Control Commn.* 354 Mass. 408, 414. See also *Insurance Rating Bd.* v. *Commissioner of Ins.* 356 Mass. 184, 189, and cases cited. If, as the board urges, however, the statute does not limit the authority of school committees to redraw district boundaries, then the restriction upon involuntary bussing could be easily circumvented. Since the right to object to bussing arises only when a school committee proposes to transport a pupil outside his attendance district, it would be possible to nullify the restriction simply by establishing gerrymandered or excessively large districts.[19]

We are convinced that the Legislature meant to forbid both practices. We reach this conclusion not only because allowing such districts would make a

---

[19] Nor is there any merit in the board's related contention that, while a parent can veto the bussing of his child to a school in a distant attendance district, the school committee may assign the child to such a school, even if, as a practical matter, the assignment means that the parent must provide transportation.

In rejecting this contention, we note the mandate of G. L. c. 71, § 68, that schools shall be "conveniently situated for the accommodation of all children therein entitled to attend the public schools." As a prior Attorney General accurately observed, this ancient law (See St. 1859, c. 252, § 4) "states a continuing [State] policy . . . that pupils residing a great distance from the public school to which they have been assigned should not be compelled to furnish their own transportation." Rep. A. G., Pub. Doc. No. 12, 1966, 230, 232. While we recognize that involuntary assignment of pupils may be required to eliminate segregation, there is nothing to prevent the Legislature from forbidding this practice in connection with the achievement of racial balance which is not required by the Federal Constitution. See point 1, *supra*. See also 42 U. S. C. §§ 2000c (b), 2000c-6 (1970). Cf. *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* 402 U. S. 1, 29, 31; *San Francisco Unified Sch. Dist.* v. *Johnson*, 3 Cal. 3d 937.

mockery of the provision concerning parental objections but also on the basis of the obligation imposed on school committees to establish school districts "for . . . neighborhood[s]" and to consider safety "on an equal basis" with racial balance.

Except where a particular word or phrase has a technical meaning, we interpret words and phrases in statutes in accordance with their common and approved usage. *Canton* v. *Bruno*, 361 Mass. 598, 607, n. 8. G. L. c. 4, § 6, Third. The word "neighborhood," as used in every day conversation, suggests a section of a city or town, identifiable as such by its history or geography, where people are generally known to each other or where they live in some proximity to each other. It will sometimes, but not always, be defined by natural or other physical boundaries or by an electoral or a zoning district. At the very least, however, the word signifies nearness, as opposed to remoteness, from home. See *Langley* v. *Barnstead*, 63 N. H. 246, 247.

While G. L. c. 71, § 37D, does not require attendance at the school "nearest to a pupil's neighborhood," it does clearly indicate by the phrase, "established for his neighborhood," that school attendance districts must bear a relationship to the neighborhood where the pupil and his family reside. This statutory mandate permits the drawing of fair and equitable, but enlarged, school attendance districts, and it does not preclude the use of such techniques as "pairing," "grouping," or "clustering" of schools [20] when they achieve this result. We hold only that school attendance districts, when redrawn for the purpose of achieving racial balance, must bear a reasonable, though not necessarily a fixed, proximity to recognized neighborhoods. A school

---

[20] These terms merely connote a combination of the attendance areas of two ("pairing") or more ("grouping" and "clustering") schools, with pupils so assigned among the schools that a similar racial composition is achieved at each school in the pair, group, or cluster. See *Allen* v. *Board of Pub. Instruction of Broward County*, 432 F. 2d 362, 367, n. 5 (5th Cir.). See also Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv. L. Rev. 564, 573.

committee may, for example, include several neighborhoods and more than one school within an attendance district, but it must not draw district lines in such a way as to create a very large gerrymandered district. A more precise definition or guideline to cover every conceivable situation is not possible. Each case must be dealt with on the basis of its own facts. See *Thomas* v. *Marshfield*, 10 Pick. 364, 365, 367. See fns. 22, 23, and accompanying text, *infra*.

As to the second requirement that safety be given the same weight as achievement of racial balance, it has an obvious bearing upon the establishment of school attendance districts. While it is neither appropriate nor possible to detail every factor which bears upon the safety of school transportation, we may properly take this occasion to mention some of the most obvious factors: the distance to be travelled, the amount of time necessary for the journey, the availability of public transportation for pupils who wish to stay after school, the age of the children involved, and traffic hazards and the incidence of crime along the route. Since the racial imbalance existing in Springfield relates only to elementary schools, we observe that age may be an especially significant factor when transportation will involve young children. As a general rule, it would seem, the younger the pupil, the shorter the distance he may be required to travel consistent with the demands of safe transportation.[21]

Subject to the limitations just described, school committees possess a large measure of discretion in the

[21] As long as only the State policy of racial balance is involved, the Legislature may clearly take countervailing considerations, such as safety, into account. It is interesting to note, however, that, even where local school authorities are under a court order to dismantle a State maintained system of dual schools, there may be valid objection to bussing. The United States Supreme Court has said: "An objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process. . . . It hardly needs stating that the limits on time of travel will vary with many factors, but probably with none more than the age of the students." *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* 402 U. S. 1, 30–31.

formulation of all aspects of racial balance plans, including alteration of school attendance districts and transportation of pupils. Under State law, such committees historically have exercised the functions of deciding which school attendance districts should be changed, which schools should be closed, and which schools should be used for other educational purposes. See *Jantzen* v. *School Comm. of Chelmsford,* 332 Mass. 175, 178, and cases cited. Had the Legislature intended a radical departure from this long established policy, we think it would have so indicated in clear language. See *Leonard* v. *School Comm. of Springfield,* 241 Mass. 325, 332; *School Comm. of Gloucester* v. *Gloucester,* 324 Mass. 209, 214; *Dowd* v. *Dover,* 334 Mass. 23, 26. A fair interpretation of G. L. c. 15, § 1I, based upon the statutory language as well as upon historical considerations, is that the board must accept a plan formulated at the local level if it reasonably appears to be designed to achieve racial balance and otherwise complies with the requirements of G. L. c. 71, § 37D.

Upon review of a local plan, the board, no less than the courts, is bound by the school committee's factual determinations, provided they are supported by substantial evidence. While the board must make its own independent determination whether a plan satisfies c. 71, § 37D, we suggest for the guidance of school committees that the board set forth beforehand how it interprets, and intends to apply, the requirements of the statute.[22]

---

[22] In this respect, the board can also provide assistance to the judiciary. While an administrative or executive interpretation cannot bind the courts, weight should be given "to any reasonable construction of a regulatory statute adopted by the agency charged with . . . [its] enforcement." *Investment Co. Inst.* v. *Camp,* 401 U. S. 617, 626–627. See *Town Crier, Inc.* v. *Chief of Police of Weston,* 361 Mass. 682, 687, n. 6. The appropriate weight, in a particular case, will depend on a variety of factors, including whether the agency participated in the drafting of the legislation (*Zuber* v. *Allen,* 396 U. S. 168, 192), whether the interpretation dates from the enactment of the legislation, and whether it has been consistently applied (*Cleary* v. *Cardullo's Inc.* 347 Mass. 337, 343–344). In no event, however, will an administrative interpretation be followed if it is contrary to "plain and unambiguous terms . . . [in] a statute." *Bolster* v. *Commissioner of Corps. & Taxn.* 319 Mass. 81, 86. See generally 2 Am. Jur. 2d, Administrative Law, §§ 241–255.

The means of accomplishing this object are found in G. L. c. 30A, §§ 1 (2), (5), 2, 3, which establish rule-making procedures applicable to all but a few of the administrative agencies of State government. See also G. L. c. 30A, § 8 (advisory rulings). Although the usefulness of regulations should not be overrated, their importance is never greater than where, as here, an agency must interpret a legislative policy which is only broadly set out in the governing statute.[23] See *Cleary* v. *Cardullo's, Inc.* 347 Mass. 337, 343–344. See also *Environmental Defense Fund Inc.* v. *Ruckelshaus,* 439 F. 2d 584, 596–598 (D. C. Cir.).

4. We consider next the board's counterclaim invoking the general equitable jurisdiction of this court.

With respect to short term measures, we are not prepared at this time to say that the school committee should be ordered to include in its plan any of the three options prepared by the city school department with the assistance of the board. Such an order is plainly inappropriate before the board has consulted with, and made specific recommendations to, the school committee for a single, acceptable short-term program. See G. L. c. 15, §1I, first paragraph. See also notes, 46 B. U. L. Rev. 45, 66; 5 Harv. J. Legis, 83, 91.

Moreover, it has not been shown on the record before us that any of the options takes safety into account on an equal basis with racial balance, or that school attendance districts, as redrawn, will bear a reasonable

---

[23] For an eloquent statement of the policy reasons for encouraging rulemaking, see Douglas, J., in *National Labor Relations Bd.* v. *Wyman-Gordon Co.* 394 U. S. 759, 775–780 (separate opinion). Pertinent here is the following passage: "Failure to make full use of rulemaking power is attributable at least in part 'to administrative inertia and reluctance to take a clear stand.' . . . Rule making is no cure-all; but it does force important issues into full public display and in that sense makes for more responsible administrative action" (citation omitted). *Id.* at 779. See Shapiro, The Choice of Rule-making or Adjudication in the Development of Administrative Policy, 78 Harv. L. Rev. 921 (cited by Douglas, J.); Davis, Administrative Law, § 6.15 (1970 Supp.). See also *National Labor Relations Bd.* v. *Wyman-Gordon Co., supra,* at 763–766 (opinion of the court); and at 780 (separate opinion by Harlan, J.). Compare *id.* at 769–775 (separate opinion by Black, J., with Brennan and Marshall, JJ.).

relationship to existing neighborhoods. See G. L. c. 71, § 37D, second and fourth paragraphs. While it is possible that one or more of the options meet these requirements, the record before us is inadequate to permit a ruling on this issue.[24] Even where specific recommendations have been made, the courts are without power to order a school committee to adopt the recommended measures unless the evidence is sufficient to establish that the measures satisfy *all* statutory requirements of G. L. c. 71, § 37D. See G. L. c. 15, § 1J, first paragraph.

For these reasons, it is not appropriate to grant the first prayer of the counterclaim for an order directing the school committee forthwith to implement one of the three proposed, short-term programs. As to the second prayer, there is no basis for withholding State school assistance from Springfield, at least until such time as the school committee has had an opportunity to act upon specific recommendations by the board.

Nothing we have said should be construed as an indication of our approval of the school committee's performance in complying with the racial imbalance law. Although we are not prepared to say that the performance of the school committee — or perhaps lack of performance — permits the board to withhold State funds, and while we do not order the specific relief requested, the board is entitled to some relief under our general equity jurisdiction, which it seeks to invoke by its counterclaim. See G. L. c. 71, § 37D, seventh paragraph; c. 214, §§ 1, 2. See also *Commissioner of Banks* v. *Com-*

---

[24] The long record before us is completely deficient in this respect. There is no evidence bearing upon the residential neighborhoods and the school districts. Moreover, no facts are presented to us as to the demographic aspects of the various city neighborhoods or as to the time and distance students from each of the neighborhoods will be required to travel if any of the plans should be adopted. Nor is it clear on this record that the statutory requirements, in this respect, were considered. Instead, the record concentrates upon the costs of transportation and the concomitant costs of luncheon programs and in-service training programs. Although these considerations are legitimate concerns of the school committee and the board, they are not facts relevant to the legal issues which we must consider under G. L. c. 15, § 1J, first paragraph.

*monwealth-Atlantic Natl. Bank*, 248 Mass. 302, 306–307.

Inasmuch as Springfield has failed to achieve racial balance in its elementary school system in the period since 1965, we think it is reasonable to require that the school committee, with appropriate assistance from the board, develop short-term measures consistent with G. L. c. 71, § 37D, which will achieve racial balance in all city schools by September, 1973. With this end in view (see G. L. c. 71, § 37C), we remand the counterclaim to the Superior Court with directions that, after hearing the parties, the court establish a schedule for the submission of specific recommendations by the board, for the filing of a short-term program by the school committee,[25] and for final action by the board, with sufficient time to allow for judicial review if required.[26]

5. Since the board apparently entertains constitutional doubts with respect to Springfield's long range program to build new schools, it may seek to amend its counterclaim in the Superior Court to include a prayer for declaratory relief on this question. G. L. c. 71, § 37D, seventh paragraph; c. 231A. If the board so moves to amend its counterclaim the motion should be allowed. See G. L. c. 231, § 51.[27] See also *Reading* v. *Attorney General, ante*, 266, 271.

---

[25] The schedule for the parties should also take into account the new requirement that a public hearing must be held before a school committee may change a school attendance district. See St. 1971, c. 958, inserting a new third paragraph in G. L. c. 71, § 37D.

[26] Once an acceptable plan is determined, the court has the power under G. L. c. 71, § 37D, seventh paragraph, to enforce the plan, including transportation provisions, against the school committee and any citizen of Springfield. There can be no disobedience of the court's decree whether by the school committee, or by other affected agencies, or by objecting parents. See *Commonwealth* v. *Hudson*, 315 Mass. 335, 349. "[C]ourts of equity do not lack the means of doing their duty." *Ibid.*

[27] Since the amicus curiae (see fn. 11, *supra*) alleges that the constitutionality of the city's construction program is squarely raised by *Maness* v. *Springfield School Committee*, Civil Action No. 71–143–M (D. Mass.), it may also be that the plaintiffs in the *Maness* case, as well as any other residents of Springfield alleging that the racial imbalance law is unconstitutional as applied to them, will seek to intervene in the Superior Court. The judge may allow any such motion within his discretion under G. L. c. 231, § 51.

While we will sometimes express an opinion on an issue not necessary to adjudicate the claim immediately before us (see *Wellesley College* v. *Attorney Gen.* 313 Mass. 722, 731), we cannot decide a constitutional question unless it is properly presented. In this respect, we have said: "Only when the impact of a statute upon particular individuals . . . and upon a set of definite facts . . . has been shown, can a court decide a constitutional question with confidence that relevant considerations have not been overlooked." *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 246. What is lacking in the present record (see fn. 13, *supra*), are facts which would permit us to determine whether the proposed new school sites, approved in accordance with State law, will have the effect of depriving black parents and children of the equal protection of the laws.[28] United States Constitution, Fourteenth Amendment. Massachusetts Constitution, Declaration of Rights, art. 1. It is for that reason that we express no opinion on the constitutional issue at the present time. Compare *Commonwealth* v. *Gilfedder*, 321 Mass. 335, 337–338.

In the Superior Court, however, upon a prayer for a declaratory decree, the parties will have the opportunity, not possible here, for a full evidentiary hearing

---

[28] The record, for example, gives no indication whether the board's objection relates to the closing of public school facilities in the black community, or to disproportionate bussing of black children, or both. Federal decisions bearing on these issues have depended in large measure upon the particular facts before the court, and have usually involved cases of segregation by State action. See *Norwalk CORE* v. *Norwalk Bd. of Educ.* 423 F. 2d 121, 124, 125–126 (2d Cir.); *Allen* v. *Asheville City Bd. of Educ.* 434 F. 2d 902, 905–906 (4th Cir.); *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* 328 F. Supp. 1346, 1352 (W. D. N. C.); *Hart* v. *County Sch. Bd. of Arlington County,* 329 F. Supp. 953, 954–955 (E.D. Va.); *Carr* v. *Montgomery County Bd. of Educ.* 429 F. 2d 382, 385 (5th Cir.); *Mims* v. *Duval County Sch. Bd.* 447 F. 2d 1330, 1333 (5th Cir.); *Lee* v. *Macon County Bd. of Educ.* 448 F. 2d 746, 753–754 (5th Cir.); *Smith* v. *St. Tammany Parish Sch. Bd.* 302 F. Supp. 106, 108 (E. D. La.); *Haney* v. *County Bd. of Educ. of Sevier County,* 429 F. 2d 364 (8th Cir.); *Clark* v. *Board of Educ. of Little Rock Sch. Dist.* 449 F. 2d 493, 496 (8th Cir.); *Brice* v. *Landis,* 314 F. Supp. 974, 978 (N. D. Cal. [9th Cir.]). See also *Spangler* v. *Pasadena City Bd. of Educ.* 311 F. Supp. 501, 524 (C. D. Cal.), denial of motion to intervene affirmed, 427 F. 2d 1352 (9th Cir.). See generally Supreme Court Note, 85 Harv. L. Rev. 40, 81–82; Note, 46 N. Y. U. L. Rev. 1078, 1101–1102.

where they can develop a record which is adequate for constitutional adjudication. See *Pinnick* v. *Cleary*, 360 Mass. 1, 37–38 (concurring opinion). Among other things, the judge should receive in evidence the most recent information concerning the impact of Springfield's proposed school building program. This should include the so called "Clinchy Report," which is not in the present record, but which the parties have informed us may have a material bearing on this case.

If the judge, after hearing the parties, decides to reserve and report the constitutional question for the consideration of this court, he should provide us not only with all evidence presented by the parties but also with appropriate findings and rulings. Since cases coming to us under G. L. c. 214, § 31, must be "ready for a final judgment" (*Taft* v. *Stoddard*, 141 Mass. 150), as a general matter it is essential to have such findings and rulings before us especially where the evidence is either complex or conflicting.[29] See *M. Steinert & Sons Co.* v. *Tagen*, 207 Mass. 394, 397; *Daly* v. *Foss*, 209 Mass. 470, 471. In the event a statement of agreed facts is offered by the parties, the judge should make certain that the statement contains all facts, pertinent to each issue reserved and reported, and necessary for a final decree in the case. Cf. *Whitney* v. *Wellesley & Boston St. Ry.* 197 Mass. 495, 502.

Regardless of any legal problems concerning Springfield's long-range program to build new schools, the judge below must insist on development and implementation of effective short-term measures by September, 1973. In remanding the counterclaim to the Superior Court with these instructions, we are not unmindful

---

[29] Nothing stated herein, however, should be construed as precluding the judge below from deciding the constitutional issues on his own without recourse to G. L. c. 214, § 31. It is fully within the competence of judges of the Superior Court to adjudicate claims under the State and Federal Constitutions. Appellate review is available under the provisions of G. L. c. 211A, §§ 10–13, inserted by St. 1972, c. 740, § 1, and G. L. c. 214, §§ 19–29.

that the school committee's reluctance in May, 1971, to adopt a short-term program may have been based in large measure upon the board's abrupt turnabout in policy between December 15, 1970, and January 26, 1971, toward the long-range, building program. Therefore, although it is not possible at this time to set a date certain for the construction of new schools, we expect that the board will move expeditiously to resolve its doubts concerning the long-range program so that Springfield will have the new schools which it is authorized to build under the racial imbalance law. See G. L. c. 15, § 1I, third paragraph.

6. We think it appropriate to remind the parties that, under the racial imbalance law, the duty of correcting imbalance in the public schools is primarily upon State and local educational authorities, and not upon the courts. In the first instance, each local school committee must devise a racial balance plan, and if the committee fails to accomplish the legislative objective then State authorities must recommend a satisfactory plan. While we recognize that these tasks may be unpleasant and controversial as well as difficult to perform, the agencies concerned should understand that the assistance which courts can offer is limited both by the racial imbalance law itself and by the State Constitution. See G. L. c. 15, § 1J; c. 71, § 37D, seventh paragraph; Massachusetts Constitution, Declaration of Rights, art. 30. Thus, although we will pass on questions of law related to the interpretation and the enforcement of the statute, it is not appropriate for us to enter directly into the formulation of racial balance plans, for this is a strictly administrative function committed to agencies of the executive department of government. See *Berman* v. *Board of Registration in Medicine,* 355 Mass. 358, 360. See also fns. 22, 23, and accompanying text, *supra.*

7. On the school committee's bill, a final decree is to be entered setting aside the orders of January 4, and May 25, 1971, withholding State school assistance from

Springfield. On the counterclaim, an interlocutory decree is to be entered remanding the case to the Superior Court for further proceedings in accordance with this opinion.

*So ordered.*