SCHOOL COMMITTEE OF BOSTON & another *vs.*
BOARD OF EDUCATION.

Suffolk.    December 6, 1972. — February 2, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY,
KAPLAN, & WILKINS, JJ.

*Racial Imbalance Law. Education. School and School Committee.
Administrative Agency. Constitutional Law*, Separation of powers.
*Interest. Equity Pleading and Practice*, Decree, Appeal.

In a suit in equity by the school committee of a city against the
State board of education, the judge did not err in deciding that
the board had acted arbitrarily and illegally in causing State
funds to be withheld from the city on the basis of an unwarranted
determination by the board that the committee had not shown
progress within a reasonable time in eliminating racial imbalance
in its schools. [27–31]

Interest was not payable on funds ordered to be released to a city
after the State board of education had arbitrarily and illegally
caused them to be withheld under the racial imbalance law. [31–32]

In a suit in equity by the school committee of a city against the
State board of education, a certain decree ordering the plaintiff to
develop a plan of short term measures toward "achieving maxi-
mum progress in the reduction of racial imbalance" in the city's
schools, although termed "interlocutory," was in substance final
and properly before this court on an appeal from it, even though
future hearings on the matter were scheduled. [32]

In a suit in equity by the school committee of a city against the
State board of education, where the judge, although character-
izing the performance of the school committee with respect to
the racial imbalance law by the words "minimal," "reluctance"
and "lethargy," nevertheless concluded that the committee was
in "literal" compliance with the terms of the law and entitled to
a release of State money which the board had caused to be with-
held, he was not thereby precluded from further ordering the
committee to develop a plan of short term measures toward "achiev-
ing maximum progress in the reduction of racial imbalance" in
the city's schools. [32–35]

In a suit involving the racial imbalance law, judicial supervision
which may be undertaken to insure a school committee's compli-
ance with that law must be exercised within the constitutional
limits of the judicial function; the function of the courts under
that law is simply to determine whether, as a matter of law, a
racial balance plan presented for review conforms to the law and

the Constitution, not to initiate specific, isolated reforms or to enter directly into the formulation of plans. [34–35]

BILL IN EQUITY filed in the Superior Court on October 26, 1971.

The suit was heard by *Robert Sullivan*, J.

*James D. St. Clair* (*Stephen H. Oleskey* with him) for the School Committee of Boston & another.

*Walter H. Mayo, III*, Assistant Attorney General (*Andrew M. Wolfe*, Assistant Attorney General, with him) for the Board of Education.

REARDON, J. This case is here on a bill for judicial review, declaratory relief, and relief in equity brought against the Board of Education of the Commonwealth (board) by the School Committee of the city of Boston (committee). The bill alleged that the board had acted arbitrarily in withholding State school funds (due under G. L. c. 70) from the committee under the racial imbalance law (G. L. c. 15, §§ 1I–1K, and c. 71, §§ 37C, 37D, all as amended).[1]

On November 15, 1971, a judge of the Superior Court entered a preliminary injunction enjoining the board from withholding the State funds from the committee. On appeal the single justice, on December 2, 1971, on stipulation of the parties, vacated the preliminary injunction and ordered the funds certified but withheld, until either the parties agreed to the release of the funds or a final decree was entered in the suit from which no appeal was taken.

On December 29, 1971, the board filed an answer and counterclaim alleging that the committee had not made reasonable progress in eliminating racial imbalance within the meaning of G. L. c. 15, § 1I, that a "Fourth Stage Plan," "as amended by the Committee on September 21, 1971," was not a plan to eliminate racial imbalance within the meaning of G. L. c. 71, § 37D, and had not

[1] For a description of the operation of these statutes, see footnotes 1 and 5 of *School Comm. of Springfield* v. *Board of Educ.* 362 Mass. 417, 419, 424.

been approved by the board, and that since 1964 the committee had engaged in a purposeful pattern of racial discrimination in violation of the Fourteenth Amendment. The board sought a declaration to this effect, and specific relief ordering the committee to file a plan to eliminate racial imbalance, withholding all State funds until such plan was filed and implemented, and ordering the committee to maintain on a racially balanced basis all schools constructed since 1966 and to be constructed in the future, in addition to such other relief as the court deemed just and proper.[2]

Following eight days of trial on the merits of the bill and counterclaim, and the introduction of some 163 exhibits, the trial judge made extensive findings and, regarding the bill for judicial review, concluded that the board had acted "arbitrarily, in abuse of its discretion, and in a manner not consistent with the public interest" in withholding the funds, and by a final decree ordered it to effectuate their release.

Treating the board's counterclaim separately, the judge made further findings, notably that while the committee was in "literal" compliance with the terms of the law, its compliance was "minimal," and its performance characterized by "reluctance and lethargy." However, consistent with his ruling on the bill, the judge refused to declare that the committee had not made reasonable progress toward eliminating racial imbalance and refused to order funds withheld. He furthermore found that there was insufficient evidence to show that the committee had violated the Fourteenth Amendment. Noting that various other prayers for relief were moot by virtue of the general equitable relief he was granting the board, the judge went on to frame an "interlocutory decree" which (a) ordered the committee to develop a plan of short term measures toward "achieving maximum progress in the reduction of racial imbalance in the pub-

---

[2] Amendments to the counterclaim were filed on August 10, 1972, alleging violations of the Racial Imbalance Act by the committee subsequent to December 29, 1971.

lic schools of the City of Boston by June 20, 1973"; (b) ordered the committee to set up a schedule for the development of such plan; (c) required the appointment of a special master to report to the court on the implementation of the decree; (d) scheduled hearings to begin on June 20, 1973, on the plan, following which the judge anticipated issuing a final decree establishing a schedule for the achievement of complete racial balance; and (e) ordered that the Lee School and schools constructed since 1966 for the purpose of reducing racial imbalance be balanced by January 1, 1973 (subsequently modified to September, 1973).[3]

On October 11, 1972, the single justice vacated the interlocutory decree of December 2, 1971, and ordered the funds released.

The parties appeal from the final decree, and the committee appeals from the "interlocutory decree." [4]

While the record goes into some detail in developing the history of the committee's operation under the racial imbalance law and its relationship with the board, we set forth only those facts necessary to the disposition of the issue before us.

The first racial census conducted under the racial imbalance law in October, 1965, revealed that forty-six Boston schools out of approximately 200 were racially imbalanced. In accordance with the law the board requested a plan for the elimination of racial imbalance. The committee submitted a plan, which was rejected.

[3] The Lee School was the center of the controversy which led to the board's withholding funds in September, 1971. The Lee School and the other schools referred to in this order were constructed with funds designated for school construction to promote racial balance, "65 percent schools," so called, and additional financial aid (sixty-five per cent rather than forty per cent) was rendered (or is due) to the city of Boston under G. L. c. 15, § 1I for their construction.

[4] Counsel represented to us at time of argument that there are a certain number of racially imbalanced schools in the city of Boston which in no event can be racially balanced by the application of procedures established by the racial imbalance law. Relative to these schools in imbalance, there is nothing before us to enable us to determine whether such imbalance is State imposed. On this record we thus refrain from consideration of any issues which might be posed by the State and Federal constitutions on these facts. See *School Comm. of Springfield* v. *Board of Educ.* 362 Mass. 417, 445–446; *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* 402 U. S. 1.

Thereafter, two task forces of educators from the committee and the board were set up to assist in the development of a plan.  Following the 1966 census, which showed forty-nine schools to be imbalanced, as a result of the joint efforts of the task forces the committee submitted a plan, approved by the board on March 15, 1967, called "The First Stage Plan."  This plan relied chiefly on new school construction as a long term solution to racial imbalance (including the Lee School).  For short term relief the plan relied on Metco, Exodus, and open enrollment.[5]

In June, 1968, the "Second Stage Plan" was submitted to, and approved by, the board, again with the major theme of construction of new schools in "fringe" areas (bordering demographically white and nonwhite neighborhoods).  In May, 1969, a "Third Stage Plan" was submitted and subsequently approved.  The October, 1969, census showed sixty-two imbalanced schools, but no request for a plan was made.  The October, 1970, census showed sixty-four imbalanced schools.  On October 27, 1970, the board voted to modify the open enrollment policy

[5] The following definitions appear in the glossary of terms provided by the trial judge in his findings and rulings.  Metco is a "privately administered, publicly funded program called Metropolitan Council for Educational Opportunity (a voluntary *intercity* program).  This plan is designed to reduce racial imbalance within the Boston schools by identifying non-white students in the City of Boston school system who volunteer to participate and placing them voluntarily in metropolitan or suburban school systems.  The city or town cooperating with Boston must, of course, volunteer to do so.  Transportation is provided by Metco for the convenience of the students.  This program, up to now, has involved principally high school students.  Metco began on a token basis, but now is much enlarged."

"Operation Exodus (a voluntary *intracity* program) is a private organization separate from but similar to Metco.  Exodus operates within the confines of the City of Boston in placing non-white children or in transferring them from imbalanced schools to balanced schools within the Boston school system.  The students who participate in this program do so on a voluntary basis, and transportation is provided by Operation Exodus."

The open enrollment policy is "a policy extant in the Boston public school system since about 1962 (now superseded), wherein pupils may attend any school in the City of Boston provided there is an empty seat for said pupil in excess of the number of seats required to meet the demand of the attendance district for that particular school."

by requiring that a student could transfer only if that transfer decreased racial imbalance at his current school or at the transferee school. On November 24, 1970, the board requested another plan.

Negotiations took place during the winter and spring of 1971, characterized by insistence on the part of the board that the committee adopt the "controlled transfer" policy,[6] and by confusion over the nature of the "technical assistance" to be rendered by the board. As a result of the refusal of the committee to adopt the controlled transfer policy, the board voted on May 25 to withhold funds. On June 15, 1971, the committee submitted its "Fourth Stage Plan." On June 22, 1971, the board rejected the plan.

In effect, the "Fourth Stage Plan" was a report on the operation of Metco and Exodus, a report on the balancing of newly constructed schools, including adoption of a certain plan for districting for the Lee School,[7] a progress report on the construction program, and a lengthy proposal for "metropolitanization." [8]

The crux of the board's objections were (a) the refusal of the committee to adopt the controlled transfer policy;

---

[6] The controlled transfer policy "(superseding the open-enrollment policy) is in effect a majority-race to minority-race transfer policy. More specifically, a student may transfer to any school in the City of Boston provided that the school to which that pupil transfers contains a minority of students of like race to the transferring pupil and the school *from* which the student transfers has a majority of students of like race to the transferring student. Thus the policy, majority-to-minority transfer policy, permits only such transfers as to decrease racial imbalance."

[7] The district lines for the Lee School had been drawn to include some students previously attending predominately white Fifield and O'Hearn schools. However, the committee allowed neighboring Fifield and O'Hearn pupils the *option* of attending either of those schools or the Lee School.

[8] Metropolitanization implies the combination of urban and suburban school systems. Under the "Fourth Stage Plan," this would be accomplished by an "ascription plan" under which a number of nonwhite Boston students would be absorbed by the schools of seventy-four communities lying within a radius of twenty miles of Boston. The most obvious of several difficulties with this proposal is that not only does the board lack statutory power to enforce such a plan, but it also ignores the racial imbalance law's prohibition against compulsory long haul busing.

and (b) the modified districting policy for the new Lee School.

On July 19, 1971, the committee submitted amendments to the plan, which were rejected by the board. On August 16, 1971, the committee submitted other amendments. These apparently were neither rejected nor accepted.

On August 23, 1971, in response to resolutions of the board covering essentially the same matters, the committee adopted a third set of amendments. Most importantly, the committee adopted the controlled transfer policy and eliminated the "modification" of the Lee School districting.

On August 31, 1971, the board approved the amendments to the "Fourth Stage Plan." The committee was notified that it had been found in compliance with the requirement that it submit a plan for the elimination of racial imbalance, and, on September 1, the funds previously withheld were released.

On September 8, 1971, the Boston schools opened, and contemporaneous events in the Lee, Fifield and O'Hearn districts were characterized by the trial judge as "chaotic."

Many black children living near the Lee School, but outside the new lines, reported to the Lee School. Simultaneously, many white children who had formerly attended the Fifield and O'Hearn schools but under the new districting were supposed to attend the Lee School refused to do so. There was heated controversy and widespread publicity. In this climate, at a public meeting held on September 21, 1971, in the O'Hearn School auditorium, the committee voted to revert to the "modification" of Lee School districting, and allow blacks who had improperly registered at the Lee School to remain there. The commissioner and the board had declined an invitation to attend this meeting.

On September 28, the board met and, without having made any effort to obtain accurate firsthand information of the circumstances surrounding the committee vote, and apparently after considering that action alone, declared

the committee to be in violation of its previously approved plan, and declared that the committee had not made progress within a reasonable time toward eliminating racial imbalance and therefore voted to withhold funds.

The October, 1971, census revealed that sixty-five to sixty-seven schools were imbalanced, and that seventy-nine per cent of nonwhite pupils attended imbalanced schools.

1. We first consider whether the judge was in error in finding that the board acted illegally in causing State funds to be withheld from the city. We have before us a full transcript of the evidence and a report of material facts, and on familiar principles we "examine the evidence and decide the case according to our own judgment, accepting as true the findings of the trial judge, whether based wholly or partly upon oral evidence, unless they are shown to be plainly wrong, and finding for ourselves such other and additional facts as we deem to be justified by the evidence." *Sulmonetti* v. *Hayes*, 347 Mass. 390, 391–392. See *Bianchi* v. *Retirement Bd. of Somerville*, 359 Mass. 642, 644. The judge ruled, as matter of law, that "the Board by its action in withholding the state aid funds due the City of Boston under G. L. c. 70, § 5, acted arbitrarily, in abuse of its discretion, and in a manner not consistent with the public interest." A review of the evidence leads us to agree with the judge. The basis of the board's action lay apparently in its determination that "the Boston School Committee has not shown progress within a reasonable time in eliminating racial imbalance in its schools." The board argues from a set of statistics contained in its brief that racial imbalance has in fact increased in Boston since the passage of the racial imbalance law, and that this supports its determination that progress within a reasonable time to relieve the imbalance has not thus been achieved. However, the judge indicated that complicated factors such as demographic changes precluded him from viewing the statistical evidence as clear proof of failure to make progress "within a reasonable time." In the light of the board's own

actions, we do not feel it incumbent on us to examine independently and in detail the entire history of the operations of the committee under the law since 1965 and measure them against statutory standards. Over the last seven years, by certifying funds to the committee and approving of successive plans, the board has, by implication, given evidence of its own satisfaction that progress was being made. In fact, on August 31, 1971, less than one month before its determination on September 28, 1971, that the committee had not made "progress within a reasonable time" in eliminating imbalance, the board voted to release previously withheld funds, thus giving rise to the unmistakable implication that from its point of view progress in the situation was being made. Indeed, the commissioner, in a statement to the board on August 31, 1971, immediately prior to that vote noted, "I am happy to be able to report substantial progress toward eliminating racial imbalance in Boston." The only event of significance which occurred during the month between the decision to release funds and the decision to withhold them was the committee's vote at its September 21, 1971, meeting to revert to the "modification" in the Lee School districting, and it was apparently this event alone of which the board complained at its September 28, 1971, meeting and which led it at that time to withhold funds. Before us, therefore, is the narrow question whether the committee's reversal on the modification of the Lee School districting justified a determination by the board that progress was not being made.

In our view the standard of "progress within a reasonable time" is not rigid but calls for a fair consideration of the total circumstances of the case. The Lee School is one of 203 public schools in Boston. Its student population of some 1,100 is approximately one per cent of the total Boston public school population, and the fraction affected by the districting decision is even smaller. Whatever symbolic status has been conferred on the Lee School by the course of events and massive publicity, it cannot be said that the statute contemplated that failure to balance

one school, under extremely aggravated circumstances, should justify reversal of a prior determination that overall progress was being made.[9]  The board argues that the failure to open the Lee School as racially balanced "made it extremely unlikely that the School Committee's construction program would be effective to eliminate, or even to reduce, racial imbalance in the future," and at the trial made a similar argument to the effect that the Lee School episode convinced the board that the committee was not acting, and would not in the future act, in good faith.

In addition, there were certain extenuations surrounding the opening of the Lee School.  Not the least of these was the fact that the change in districting policy making attendance at that school compulsory for students within the district took place only eight days before the school year began.  It is noteworthy that the board not only declined an invitation to attend the September 21, 1971, school committee meeting and sent no representative or observer to that meeting, but thereafter proceeded to vote to withhold funds without obtaining firsthand information about what occurred at the meeting.  It did not consult or inquire of the committee concerning the meeting.  It did not even receive official notification of the committee vote.  In view of the foregoing, we agree with the judge that the action of the board could properly be termed "arbitrary."

As was pointed out in *School Comm. of Springfield* v. *Board of Educ.* 362 Mass. 417, 436, there are two situations, in addition to a finding that progress within a reasonable time toward the implementation of an approved plan is not being made, that may justify the board in withholding funds: (1) when a school committee rejects the board's specific recommendations for a plan; or (2) after specific recommendations by a committee have been

---

[9] An indication both of the complexity of the Lee School situation and the limited significance of the modification is the testimony by the Lee School principal in this case that in September, 1972, if all students within the Lee district attended that school it would be sixty-five per cent black.

made the board rejects the committee's revised plan. None of these situations obtains here. The committee had formulated a plan, and submitted it to the board and the board had approved it. The action of the committee on September 21, 1971, relative to one facet of the plan, did not constitute a rejection of that plan or specific recommendations for another plan. Indeed, the board itself in the vote which followed a week later stated merely that "the Board of Education finds the Boston School Committee to be in violation of the plan which they duly adopted and which this Board duly approved." Furthermore, we see no indication that the board at any time thereafter rejected the committee's "revised plan." The testimony at trial indicated that the commissioner and the board in the weeks after September 28, 1971, took the position that amendments adopted by the committee on August 23, 1971, were still in effect.

In any case, a serious question exists whether the board met its statutory obligation to provide technical assistance to the committee. As the *Springfield* case emphasized, it must fulfil this obligation before it is entitled to move to withhold funds. The board argues that it was a participant in intense negotiations during the spring and summer of 1971 in an attempt to aid the committee in formulation of a plan. However, there is meager evidence on hand that the board proffered anything in the nature of "technical assistance" to the committee. Indeed, the results of a feasibility study of redistricting, apparently performed by the board, were never even communicated to the committee. The recommendations which were submitted involved only proposed changes in the feeder system for certain high schools and intermediate schools, a four page document devoid of specific explanation or rationale. The board's "technical assistance" resolved itself down to a succession of demands that the committee adopt various general policies and goals.

We conclude on this point, therefore, that there was no error in the judge's finding and in the ruling based

thereon, that the board acted "arbitrarily, in abuse of its discretion, and in a manner not consistent with the public interest."

2. It is the contention of the committee that it is entitled to interest on funds ordered paid to the city which had been improperly withheld. We do not agree with this contention. Sections 1I and 1J of G. L. c. 15, inserted by St. 1965, c. 641, § 2, are silent on the subject of payment of interest on withheld funds.[10] The committee argues that interest is allowable here on the theory that interest should be allowed where money has been improperly detained. However, this concept had its development in the context of contract law and all the cases cited by the plaintiffs involved interest on awards against one of the parties in a contractual relationship. It is well known in general that the law applicable to public contracts is the same as that applicable to private contracts. *R. Zoppo Co. Inc.* v. *Commonwealth,* 353 Mass. 401. It therefore follows that in such instances the Commonwealth is bound to pay interest where interest would be charged against a private person. *C. & R. Constr. Co.* v. *Commonwealth,* 334 Mass. 232, 233. This rule, however, is not controlling here. We deal with a statute permitting the State agency to withhold funds from municipal school systems and explicitly contemplating subsequent voluntary release of those funds and the possibility of judicial review of the determination which initially caused them to be withheld. It is silent on recovery of interest on withheld funds in any circumstances. See *Cambridge* v. *Commissioner of Pub. Welfare,* 357 Mass. 183, 186. On the principles of strict statutory construction, we are of the view that contract rules do not control, and in our opinion, therefore, no

---

[10] Section 1I in its provisions relative to the release of withheld funds states only that "the commissioner . . . may thereafter upon receipt of a plan acceptable to the board of education notify the commissioner of corporations and taxation and the comptroller to pay any such withheld funds to such city . . . ." No reference is made to the situation where funds are released pursuant to a court order overruling the board.

interest on the funds withheld is payable to the city.

3. The judge concluded that the equity suit was divisible and, therefore, following the format established by this court in the *Springfield* case, treated the bill of the committee and the counterclaim of the board separately. *School Comm. of Springfield* v. *Board of Educ.* 362 Mass. 417, 443–444. It is argued by the board that the "interlocutory decree" is so "in fact as well as in name, and is not appealable."

As a general rule, only decrees which are final can be appealed in equity. G. L. c. 214, § 19. However, whether a particular decree is "final" or not is not determined solely by the label given to it by the trial court. In *Check* v. *Kaplan,* 280 Mass. 170, 176, although a decree was termed "interlocutory" by the trial judge, this court held that "in substance and effect [it] is final so far as concerns the plaintiff," and dealt with it as a final decree. Similarly, in *Kingsley* v. *Fall River,* 280 Mass. 395, 398, the court recognized that "[t]he nature of a paper entered on the record of a court must be determined according to its essential characteristics and not by its name."

In *General Heat & Appliance Co.* v. *Goodwin,* 316 Mass. 3, 5, we similarly found that an "interlocutory decree" should be treated as final despite the fact that it contemplated the possibility of supplemental decrees because it conclusively determined the matters in issue.

Under these principles the "interlocutory decree" issued by the trial judge must be treated as final and therefore properly before us on appeal. The case was heard for eight trial days and the trial judge made extensive findings of fact and rulings of law. The legal issue, namely, the performance of the committee under the law, has been settled. The fact that future hearings are scheduled does not affect the finality of the determination of that substantive issue, and should not prevent review of it on appeal.

The committee argues that the order directing the development of a plan of short-term measures toward the end of achieving maximum progress in the reduction of

racial imbalance must be set aside because it is supported neither by the evidence nor by the judge's findings of fact and rulings of law. The crux of this argument appears to be that since he found that the committee was in literal compliance with the racial imbalance law, and accordingly ruled that the board could not withhold funds from it, he has no authority to act further in the case. Such a reading of the statute is unduly narrow.

General Laws c. 15, §§ 1I–1J, prescribes the situations in which State funds may be withheld from school committees. There is, however, no reason to conclude that this mechanism was intended to be the exclusive means of encouraging the achievement of racial balance in the public schools, and implementing the basic policy expressed in G. L. c. 71, § 37C. Chapter 71, § 37D, requires that whenever a school committee is notified by the board that racial imbalance exists in one of its schools, "[t]he school committee shall thereupon prepare a plan to eliminate such racial imbalance and file a copy of such plan with the board." That section goes on to discuss other aspects of the development of the plan. Its last sentence states, "The supreme judicial and the superior court shall have jurisdiction in equity upon petition of the board of education to enforce the provisions of this section."

For this equity jurisdiction to be exercised, at least with regard to the development of a plan, there is no requirement that the committee have failed to make reasonable progress, nor that any of the other situations exists which, in c. 15, are prerequisites to withholding funds.

As we noted in the *Springfield* case at 443–444, "Nothing we have said should be construed as an indication of our approval of the school committee's performance in complying with the racial imbalance law. Although we are not prepared to say that the performance of the school committee — or perhaps lack of performance — permits the board to withhold State funds, and while we do not order the specific relief requested, the board is entitled to some relief under our general equity jurisdiction which

it seeks to invoke by its counterclaim.   See G. L. c. 71, § 37D, seventh paragraph; c. 214, §§ 1, 2.   See also *Commissioner of Banks* v. *Commonwealth-Atlantic Natl. Bank,* 248 Mass. 302, 306–307."   In the *Springfield* case we specifically suggested that the lower court, on remand of the counterclaim, establish a schedule for the filing of a short-term plan, precisely as was done here.

There is no requirement for elaborate proof of less than enthusiastic performance by the committee.   Whatever the complicating factors may be, the plain fact remains that racial imbalance in the Boston schools has increased significantly in the seven years since the passage of the racial imbalance act.

The board argues that "in light of the perennial failure of the school committee to take effective measures to eliminate racial imbalance, the trial court could reasonably conclude that the school committee was in need of judicial supervision."   This argument is valid only to the extent that any "judicial supervision" requested by the parties or undertaken by the trial judge consists of action which is within the constitutional limits of the judicial function.   Without attempting a definitive statement of those limits we repeat our recent statement in *School Comm. of Springfield* v. *Board of Educ.* 362 Mass. 417, 447, that "although we will pass on questions of law related to the interpretation and the enforcement of the [racial imbalance] statute, it is not appropriate for us [or the trial judge] to enter directly into the formulation of racial balance plans, for this is a strictly administrative function committed to agencies of the executive department of government."   Art. 30 of the Declaration of Rights of the Massachusetts Constitution.   This court can make no decision whether specific action by a trial judge with reference to the formulation of such plans exceeds the limits of the judicial function until a case comes before us properly presenting that question.   This case does not.

Any problems under the Fourteenth Amendment to the Federal Constitution can be dealt with if and when they

arise. Remedies for them were referred to in *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* 402 U. S. 1, 16: "In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults."

With the comprehensive findings and rulings of the judge, and with the entire record of the case before us, it is not possible to conclude that the performance of the committee was in line with the objectives of the act. Those portions of the "interlocutory decree" which establish a schedule for the development of a short-term plan are therefore proper.

We think, however, that so much of the "interlocutory decree" as orders the committee to balance the Lee School and the other schools constructed since 1966 for the purpose of reducing racial imbalance, with additional State aid by January 1, 1973 (as modified to September, 1973), should be struck out. Particularly in light of the fact that the trial judge has ordered development of a comprehensive short-term plan, which is presumably to take effect in the 1973–1974 school year, we think that it is inappropriate for the trial judge to attack the problem piecemeal.

Given the probable complexities of balancing these schools, and the inevitable impact of such redistricting on other schools, we believe that such action should be taken as part of the general plan to be developed by the parties. Furthermore, as we said in the *Springfield* case at 447, "the duty of correcting imbalance in the public schools is primarily upon State and local educational authorities, and not upon the courts." The function of the trial judge is simply to determine whether as a matter of law the plan presented for his review conforms to the act and the constitution, not to initiate specific, isolated reforms.

It follows that the final decree is affirmed with no in-

terest payable to the city of Boston on the funds withheld, and the "interlocutory decree" is affirmed with the modification indicated above.

*So ordered.*