SCHOOL COMMITTEE OF BOSTON *vs.* BOARD OF EDUCATION
& another.

Suffolk.     September 18, 1973 — October 29, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY,
KAPLAN, & WILKINS, JJ.

*Racial Imbalance Law. Education. School and School Committee. Equity
Jurisdiction,* Review under the racial imbalance law.

The State board of education, upon inquiring in 1973 as to the basis of its
determinations in 1972 that a plan of a school committee to eliminate
racial imbalance in the public schools which was disapproved by the
board but was still relied on by the committee "did not satisfy G. L.
c. 71, § 37D," and that the facts found by the committee were not "sup-
ported by substantial evidence," was not limited to considering only
the evidence before the board when it disapproved the plan, but proper-
ly examined the plan against the background of information compiled
at hearings before its examiner in the interval between its disapproval
and its inquiry. [203-204]
A determination by the State board of education that redistricting of the
public schools of a city was both "permissible and mandatory" in order
to achieve compliance with G. L. c. 71, §§ 37C, 37D, was supported by
evidence presented to the board's hearing examiner and by the continu-
ous failure of the school committee's prior proposals, which omitted
redistricting, to alleviate racial imbalance in the schools. [204-205]
Substantial evidence warranted a determination by the State board of
education that its recommendations to a school committee of a city with
respect to the elimination of racial imbalance in the public schools,
which included redistricting, took into consideration "on an equal basis
with . . . [correcting imbalance] the safety of the children involved,"
as directed by G. L. c. 71, § 37D; a need for refinement to assure max-
imum safety precautions did not invalidate the recommendations.
[205-206]
Recommendations by the State board of education to the school commit-
tee of Boston with respect to redistricting of the public schools in order
to eliminate racial imbalance, which showed elementary school districts
with a maximum length of two miles and intermediate school districts
with a maximum length of five miles, took cognizance of the limitations
imposed by the neighborhood district requirement of G. L. c. 71, § 37D,
and proposed districts which are not unlawful in the context of the
Boston school system or of a size or shape so extraordinary as to render
the transportation limitation of § 37D a nullity. [206-207]

The public hearing requirements of G. L. c. 71, § 37D, as amended by St. 1971, c. 958, do not apply to the formulation by the State board of education, following its determination that a school committee has failed to file a plan in compliance with the provisions of § 37D, of "specific recommendations" for a plan by the committee to eliminate racial imbalance in the public schools. [207-209]

Upon a petition by the school committee of Boston for judicial review of an "Opinion and Order" issued to it by the State board of education directed to the adoption and implementation of a specific plan recommended by the board as needed to alleviate racial imbalance in the public schools of the city, this court noted that the board's plan provided for proposals for its modification by the committee and other interested groups before its total implementation and for technical assistance to the committee by the board, and determined that the plan was supported by substantial evidence and was not arbitrary, capricious or based upon errors of law, and ordered entry of a decree affirming the "Opinion and Order." [209-210]

BILL IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on July 25, 1973.

The case was reserved and reported by *Wilkins,* J., without decision.

*James D. St. Clair (Stephen H. Oleskey* with him) for the School Committee of Boston.

*Walter H. Mayo, III,* Assistant Attorney General *(Sandra L. Lynch,* Assistant Attorney General, with him) for the Board of Education & another.

REARDON, J. This case is here on a bill for judicial review, declaratory relief, and injunctive relief with respect to an "Opinion and Order" issued by the Board of Education (Board) to the School Committee (Committee) directed to the adoption and implementation of a specific plan recommended by the Board to alleviate racial imbalance in the schools of Boston in accordance with G. L. c. 15, § 1J, and c. 71, § 37D, as amended. The eight year experience of the Boston school system with the racial imbalance law has been adequately outlined in our prior opinions, *School Comm. of Boston* v. *Board of Educ.* 363 Mass. 20 (1973) (Boston I), and *School Comm. of Boston* v. *Board of Educ.* 363 Mass. 125 (1973) (Boston II). It is sufficient to note here that, despite urgings by this court, continuous activity and volum-

inous debate, the problem of racial imbalance which the statute sought to correct has not been resolved but has, in fact, become aggravated in the Boston schools. In November, 1972, the Board rejected a "Short Range Plan Toward Elimination of Racial Imbalance in the Boston Public Schools 1972-1973" (Committee Plan) submitted by the Committee and adopted its own plan (Board Plan) as a recommendation to the Committee. On judicial review, in the Superior Court, the trial judge held that the Board Plan did not conform to the requirements of the statute. See Boston II, 363 Mass. 125, 126-127 (1973). In Boston II, this court remanded the case to the county court and ordered the single justice to vacate the "interlocutory decree" of the judge entered on September 27, 1972, and to remand the case to the Board to hold hearings and develop an administrative record which could serve as a basis for proper judicial review of the Board's action with respect both to the Committee Plan and the Board Plan. See *Id.* at 128-132. Pursuant to this opinion the Board appointed Professor Louis L. Jaffe as a hearing examiner and hearings were held on seventeen days between March 20 and May 3, 1973. On May 29, 1973, the hearing examiner submitted his "Report and Recommendations" to the Board which, after providing opportunity for written objections to the hearing examiner's report and for oral argument, issued on June 25, 1973, the "Opinion and Order"[1] which is the subject of this review. The "Opinion and Order" substantially adopted the hearing examiner's report. It reaffirmed the Board's earlier rejection of the Committee Plan and called for the implementation of a revised Board Plan to be completed in September of 1974. The present bill was filed by the Committee on July 25, 1973.

In this court's opinion in Boston II we viewed the suggestion of hearings as a means of facilitating judicial review. *Id.* at 130. We recognized the need for further consideration

[1]Although the Board employed the word "Order," its function under G. L. c. 15, § 1J, is to submit recommendations which are subject to affirmance or disaffirmance by the court.

by both agencies of the difficult problems of alleviating racial imbalance. We noted that the "hearings may deal with the board's plan as presently formulated, or the board may see fit, since more current and specific data are apparently now available, to create a new revised plan." *Id.* at 130. In urging that the hearings should also be addressed to the reasons for the Board rejection of the Committee Plan we also suggested that the Committee should "take advantage of this period to submit a new revised plan if it sees fit." *Id.* at 130. We thus envisioned a situation in which both sides would come forward with renewed and sincere efforts to fulfil the mandate of the statute. The hearing process would then have provided an opportunity for that "measure of coöperation which citizens have the right to expect from State and city agencies working in the same field." *Id.* at 131. Unfortunately, instead of participating in the hearings in this spirit the Committee has seen fit to rest on its proposal of November 6, 1972, and has confined its arguments before the hearing examiner, the Board, and this court to attacks upon the validity of the Board Plan without offering initiatives of its own.

The issue before us then is whether the "Opinion and Order" of the Board is "(a) in excess of the statutory authority or jurisdiction of the board, or (b) based upon an error of law, or (c) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." G. L. c. 15, § 1J. We commented at length on the nature of judicial review under the act in Boston II: "The proper function of the court is not to engage in complex fact determinations more appropriately committed to an agency, with staff and skilled experience to make them. Rather, the court must accept the factual determinations made by the agency if it finds they are supported by substantial evidence, and decide only questions of law." *Id.* at 128. This court has three times emphasized the inappropriateness of judicial involvement in the complex and detailed process of educational administration required by the statute. *Id.* at 131. Boston I, 363 Mass. 20, 34-35 (1972). *School Comm. of Springfield* v. *Board of Educ.* 362

Mass. 417, 447 (1972). The task of a reviewing court is therefore a limited one and its scope has often been defined by familiar principles of administrative law. See, e.g., *Almeida Bus Lines, Inc.* v. *Department of Pub. Util.* 348 Mass. 331, 341-342 (1965).

We should thus proceed with an initial respect for the conclusions of the Board and should not lightly hold that its determinations are so unreasonable as to fail to comply with the statute. See *Cotter* v. *Chelsea,* 329 Mass. 314 (1952). Given these limitations, we now turn to the specific contentions made by the Committee.

The Committee first argues that the Board's "Opinion and Order" was improper in rejecting the Committee Plan of November, 1972, in that its method of examination was defective in two ways. The court in Boston II stated that the Board hearings should in part direct themselves to "establishing the basis of the board's determination that the [Committee] plan did not satisfy G. L. c. 71, § 37D, and . . . [to] establishing the basis of any decision of the board that the committee's factual determinations were not themselves supported by substantial evidence." *Id.* at 130. Thus the Committee contends that the Board inquiry should be limited to the propriety of the rejection based only on the evidence before it on November 9, 1972, when it was initially disapproved. But this is far too narrow an interpretation of the language of Boston II. As has been noted, the hearings were intended as part of an ongoing program of coöperation and consultation. They were not, as the Committee argues, meant to provide an explanation for a past decision but as a "vehicle for action." Thus our call for an examination of the basis for rejection of the Committee's November plan was coupled with a suggestion that the Committee submit a new revised plan. Given the submission of such a plan, it would have been futile for the Board to reëxamine its old decision which would then have been no more than an historical artifact. Since the Committee chose to rely wholly upon its earlier proposal, it was proper for the Board to examine that plan, as the most current Committee position, against the

School Committee of Boston *v*. Board of Education.

background of the information compiled in the hearings of its examiner.

Secondly, the Committee charges that the Board did not establish the basis for its finding that the factual assumptions of the Committee's Plan were unsupported by substantial evidence. The Board in its "Opinion and Order" did not, in fact, address the sufficiency of the evidence for those factual assumptions but reaffirmed its rejection of the Committee Plan as matter of law. The Board sustained the hearing examiner's conclusion that since the Committee plan provided for no redistricting it did not satisfy the statute. We do not believe that the statute mandates redistricting as an indispensable element of every plan to eliminate racial imbalance in every case. However, we conclude that the evidence presented to the hearing examiner, together with the continuous failure of the Committee's prior proposals which omitted redistricting to alleviate racial imbalance, supports the Board's determination that at this time redistricting is both "permissible and mandatory" to comply with the statute. In view of the indefinite language of the Committee Plan, it was proper for the Board to decide that such a vague commitment did not "detail [the] changes in existing school attendance districts," as called for in the statute. G. L. c. 71, § 37D.

With respect to the specific charge that the Board failed to assess the evidentiary basis for the factual assumptions of the Committee Plan, it should be noted that the Committee Plan was a three page addendum to its "Fourth Stage Plan Toward the Elimination of Racial Imbalance in the Public Schools,"[2] which promised redistricting in the future. It was proper for the Board to conclude that even if the Fourth Stage Plan's factual assumptions were correct its implementation would fail to satisfy the statute. Since indeed the future redistricting addendum made no factual assumptions

---

[2] In Boston I, this plan was described as "a report on the operation of Metco and Exodus, a report on the balancing of newly constructed schools, including adoption of a certain plan for districting for the Lee School, a progress report on the construction program, and a lengthy proposal for 'metropolitanization.'" *Id.* at 25.

at all, we agree with the Board that an examination of the factors behind the Committee's insufficient proposals would have served no purpose. In fact, a sensible reading of the opinion in Boston II reveals that such factual investigation would have been appropriate only if the basis for the Board's rejection of a Committee plan were the lack of substantial evidence to support an otherwise proper program to achieve balance. *Id.* at 130.

The Committee next attacks the Board Plan as defective in several respects. First it is argued that the plan does not take into account, on an equal basis with relieving imbalance, the safety of the children traveling to and from school as required by the statute. It should be clear from what has been said that it is not the function of this court to evaluate the safety factors involved in every district of a long and detailed plan. The question before the court is not whether the districting plan is safe but whether there was substantial evidence before the Board to justify such a determination. The evidence before the Board, the hearing examiner, and the designers of the plan, as reflected in the record, was ample. The Board Plan itself outlines the considerations given by the authors to various safety factors. Cf. *School Comm. of Springfield* v. *Board of Educ.* 362 Mass. 417 (1972). The record also reveals that the planners were supplied with adequate information on these considerations to make reasonable judgments. Information was sought and obtained from the Bureau of Equal Educational Opportunity, the Boston Traffic Department, a Registry of Motor Vehicles official who was a member of the planning group, and the Boston Police Department. Every district plan identifies possible safety hazards and ways to eliminate them, including the use of transportation where necessary. The hearing examiner heard testimony from experts of both the Committee and the Board and determined that the plan made adequate provision for the safety of the children. Given this extensive attention to safety factors, it cannot be reasonably argued that the Board lacked substantial evidence to support its decision that the plan "take[s] into consideration on an

equal basis with . . . [correcting imbalance] the safety of the children involved." G. L. c. 71, § 37D. All parties admit that the plan could be and should be improved with regard to safety factors. It is reasonable, however, to expect that such improvement must occur concurrently with the implementation of the plan. Practical experience and mutual assistance and coöperation by the parties should yield continuous refinement to assure maximum safety precautions. But such a need for refinement would be present in any plan of this type and does not invalidate the Board's current efforts. The Committee has pointed out no specific features of the plan which pose such egregious safety hazards that we could say that it is arbitrary or capricious or not in accordance with law.

The Committee next argues that the Board Plan is invalid because it provides for districts which are overly large and gerrymandered. This contention derives from our interpretation of the requirement of the statute that no balancing plan may mandate the transportation of "any pupil . . . to any school outside the school district established for his neighborhood" if objection is filed by the parent. G. L. c. 71, § 37D. In the *Springfield* case we construed that provision to place a restriction not merely on transportation but on districting as well. In order to make the quoted provision meaningful we held that "school attendance districts, when redrawn for the purpose of achieving racial balance, must bear a reasonable, though not necessarily a fixed, proximity to recognized neighborhoods." *Id.* at 439. The terms used in that opinion, "very large gerrymandered" and "neighborhood," have been the subject of much confusion and debate in the prior proceedings. It was made clear in that opinion, of course, that these terms were not intended to be so rigidly interpreted as to put a straitjacket on planning to eliminate racial imbalance and thus to frustrate the very purposes of the statute. We stated in the *Springfield* case that "[a] more precise definition or guideline to cover every conceivable situation is not possible. Each case must be dealt with on the basis of its own facts." *Id.* at 440. In the case of the city of

Boston, it is plain that residential patterns require the assimilation of white and nonwhite neighborhoods into the same attendance district if the objective of the statute is to be closely approached. Similarly, such groupings will often of necessity fail to produce regular or familiar shapes. But this alone does not amount to a violation of the neighborhood-district requirement of the statute. "This statutory mandate permits the drawing of fair and equitable, but. enlarged, school attendance districts, and it does not preclude the use of such techniques as 'pairing,' 'grouping,' or 'clustering' of schools." *Id.* at 439. So long as the redistricting process takes cognizance of the value of the neighborhood concept in its planning, and the resulting districts are comprised of areas which bear a clear geographical relationship to each other and are truly districts in that they divide the entire school system into a sufficient number of sectors, we think the statute is satisfied.

There was substantial evidence that the drafters of the Board Plan considered the limitations imposed by the neighborhood district requirement. They, in fact, asserted that the Board Plan fails to balance a number of Boston schools because of these limitations. The plan approved shows elementary school districts with a maximum length of two miles and intermediate school districts with a maximum length of five miles. While irregular shapes are frequently employed, every district save one is contiguous. It is plain that if compactness were the primary guide these districts would be far from ideal. We believe, however, that given the paramount policy of the statute these districts are not unlawful in the context of the Boston school system. We cannot say that the size or shape of these districts is so extraordinary as to render the transportation limitation of the statute a nullity. See *Id.* at 438-439.

Further objection is made because of the Board's failure to hold public hearings on the changes in districts represented by the Board Plan. The requirement of hearings is found in the statute, G. L. c. 71, § 37D, as amended by St. 1971, c. 958, and clearly applies to redistricting by the Committee

in the ordinary course of planning to eliminate racial imbalance. The issue is whether the hearing requirement obtains in cases such as this where the plan is part of a recommendation to the Committee by the Board after rejection of a Committee Plan. The Committee argues that all of the requirements of G. L. c. 71, § 37D, should apply to plans formulated by the Board as well as by the Committee. Otherwise, it is claimed, Board planning would be immune from the requirements of equal consideration of safety and neighborhood-districting. It does not follow that the planning process by the Board should adopt either all of the restrictions of G. L. c. 71, § 37D, or none of them. The requirements of considerations of safety and the prohibition on long haul busing relate to substantive aspects of the plan itself while the requirement of public hearings is a procedural matter which is more likely to be peculiar to the specific agency which is the subject of the section. The procedures to be followed by the Board with regard to the racial imbalance law are found in G. L. c. 15, §§ 1I-1K, and no requirement for a public hearing is found therein. While it is rather clear that the Legislature intended no plan wherever formulated to be implemented in the absence of precautions against safety hazards and long distance transportation, we see no persuasive reason to transfer the procedural apparatus prescribed for the Committee to actions by the Board which clearly occupy a different place in the overall technique evident in the statute for eliminating racial imbalance. The dispersed sections of the racial imbalance law must be read as a whole. *School Comm. of Springfield* v. *Board of Educ.* 362 Mass. 417, 433 (1972). The entrance of the Board into the planning process with "specific recommendations" is only required after the Committee has failed to submit a proper plan. Any situation such as this which plainly calls for redistricting would ordinarily have already had adequate public hearings by the Committee. If that is not the case here it is only because the Committee has failed to undertake serious efforts at redistricting in order to comply with the statute. We therefore hold that the public hearing requirement of G. L.

c. 71, § 37D, does not apply to the formulation of specific recommendations by the Board.[3]

The final Committee contention is that the Board Plan fails to make adequate provision for various special educational programs such as vocational and remedial programs, and is generally educationally disruptive. Nowhere in the statute is there a requirement that a racially balanced plan must totally rewrite the educational program of a school system. That there will be repercussions of the plan on matters of educational policy there can be no doubt. But such disruptions are certainly not immune to timely and intelligent adjustment by the Committee. The Committee has nowhere demonstrated that the Board Plan and quality education are irreconcilable. The Board's "Opinion and Order" makes provision for a one year process of gradual implementation and adjustment for this very purpose.

Certainly there are important and valid specific criticisms of the Board Plan. No plan of this type is or can be perfect. The shifting demographic, sociological and technological factors which bear on the problem make constant attention and adjustment vital. But, as has been made clear, it is not our function to judge the particular merits or faults of a plan. It is sufficient if the plan is underpinned by substantial evidence and is not arbitrary, capricious or based upon errors of law. If the Committee sincerely desires the correction of perceived defects its task is not one of litigation but of consultation and persuasion. We are confident that coöperation between the parties would bring the objectives of racial balance and quality education closer to realization. It is high time that such coöperation commence without the delay inherent in further footless resort to the courts.

We therefore sustain the action of the Board and note particularly the provisions of its order allowing for proposals for modification by the Committee and other interested

---

[3]It should be noted that the hearing examiner in this case permitted the intervention of all interested parties who requested it and received more than 1,200 written submissions. The hearings were the subject of extensive publicity and ample opportunity was provided for a substantial public input into the Board's planning process.

groups. The time remaining before total implementation is ample for the solution of whatever problems are evident in the Board Plan. If the Committee fails to coöperate, the Board has the power to withhold the certification of State aid for the Boston schools, and to notify the School Building Assistance Commission to withhold approval of school construction projects. G. L. c. 15, § 1I. Here a single specific recommendation has been presented to the Committee by the Board and the plan itself represents significant technical assistance by the Board. The phased implementation procedure ordered by the Board also suggests its continued readiness to supply technical assistance in the course of putting the plan into effect. Cf. Boston I, 363 Mass. 20, 29-30 (1973). Furthermore, in view of the Board's determination on the need for the plan, a refusal of the Committee to implement it would be sufficient evidence of a failure to make reasonable progress and would itself require appropriate Board action under the statute. Cf. *Id.* at 28-29. In the circumstances of this case, after years of inaction and delay by the Committee, this court has no intention of staying the Board in the exercise of its power to compel compliance with the law. The Committee must understand that the time for testing the meaning of the statute has long since passed and that the time for prompt action to implement it is at hand. The Board Plan allows for substantial participation by the Committee in the task of eliminating racial imbalance. The committee should seize this opportunity and, by contributing its knowledge, experience and good faith, ensure the improvement of the plan and its implementation.

A decree shall enter in the county court declaring that there is no error of law in the "Opinion and Order" of the Board, and affirming the "Opinion and Order."

*So ordered.*